891 F.2d 748
 ALUMINUM COMPANY OF AMERICA; Arco Metals Company; Columbia
Falls Aluminum Company, Petitioners,
Association of Public Agency Customers, Petitioner-Intervenor,
v.
BONNEVILLE POWER ADMINISTRATION; Federal Energy Regulatory
Commission, Respondents,
Portland General Electric Company; Puget Sound Power &
Light Company; Public Generating Pool (PGP),
Respondents-Intervenors.
CALIFORNIA ENERGY COMMISSION, Petitioner,
v.
BONNEVILLE POWER ADMINISTRATION; Federal Energy Regulatory
Commission, Respondents.
PUBLIC UTILITIES COMMISSION OF the STATE OF CALIFORNIA;
Southern California Edison Company; Pacific Gas and
Electric Company; San Diego Gas & Electric Company;
Department of Water and Power of the City of Los Angeles, et
al., Petitioners,
v.
BONNEVILLE POWER ADMINISTRATION; Federal Energy Regulatory
Commission, Respondents.
 Nos. 87-7303, 87-7308 and 87-7313.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted March 9, 1989.
Decided Dec. 11, 1989.
 
 Matthew Cohen, Heller, Ehrman, White & McAuliffe, Seattle, Wash., Peter G. Fairchild, San Francisco, Cal., John D. McGrane, Reid & Priest, Washington, D.C., Stephen E. Pickett, Rosemead, Cal., Glenn West, Jr., San Francisco, Cal., Thomas C. Hokinson, Sr. Asst. City Atty., Los Angeles, Cal., for petitioners.
 Jonathan Blees, Deputy General Counsel, Sacramento, Cal., for California Energy Com'n.
 Max M. Miller, Tonkon, Torp, Galen, Marmaduke & Booth, Portland, Or., Judith Bearzi, Gordon, Thomas, Honeywell, Malanca, Peterson & Daheim, Seattle, Wash., for petitioner-intervenor.
 Kurt R. Casad, Portland, Or., Joanne Leveque, Washington, D.C., for respondent.
 Pamela G. Rapp and J. Jeffrey Dudley, Portland, Or., Frederic A. Morris, Perkins Coie, Seattle, Wash., Jay T. Waldron, Schwabe, Williamson, Wyatt, Moore & Roberts, Portland, Or., for respondent-intervenor.
 Petition to Review a Decision of the Federal Energy Regulatory commission.
 Before CANBY, THOMPSON and LEAVY, Circuit Judges.
 LEAVY, Circuit Judge:
 
 OVERVIEW
 
 1
 These consolidated cases challenge the first nonfirm energy rates that the Bonneville Power Administration (BPA) established, and the Federal Energy Regulatory Commission (FERC) approved, under section 7(k) of the Pacific Northwest Electric Power Planning and Conservation Act (the Regional Act), 16 U.S.C. § 839e(k) (1982).[1] Nonfirm energy is that energy that is surplus to the needs of the Pacific Northwest. The challenged rates, schedules NF-1 and NF-2, were effective from July 1, 1981, through September 30, 1982, and from October 1, 1982, through October 31, 1983, respectively. The NF-1 and NF-2 rates applied to sales of nonfirm energy both in and outside the Pacific Northwest.
 
 
 2
 In case No. 87-7303, BPA's direct service industrial customers, joined by intervenors the Public Generating Pool, Public Power Council, Association of Public Agency Customers, and Portland General Electric (the Northwest parties), allege that BPA's rates for electricity under NF-1 and NF-2 were too low. The Northwest parties claim the rates: (1) failed to recover the costs of nonfirm energy, (2) failed to include the costs of the residential exchange program, and (3) that FERC failed to review the rates based on the administrative record of BPA.
 
 
 3
 In cases Nos. 87-7308 and 87-7313, the California Energy Commission, the Public Utilities Commission of the State of California, and the California Utilities (Southern California Edison Company, Pacific Gas & Electric Company, San Diego Gas & Electric Company, and the Cities of Los Angeles, Burbank, Glendale, and Pasadena) allege that BPA's nonfirm energy rates under NF-1 and NF-2 were too high. These California parties claim that the rates should not have included an unweighted, proportionate share of the costs of BPA's generating capacity, the costs of the mothballed nuclear plants of the Washington Public Power Supply System (WPPSS), or the costs of conservation of fish, wildlife, and energy in the Pacific Northwest.
 
 
 4
 We hold that the evidentiary hearing that FERC held upon review of the rates violated section 7(k); nonetheless, we affirm FERC's decision to approve the rates BPA established for nonfirm energy under schedules NF-1 and NF-2 from 1981 to 1983.
 
 FACTS
 
 5
 BPA is a self-financing power marketing agency within the United States Department of Energy. The rates BPA receives for electricity and its transmission are BPA's only sources of revenue. Central Lincoln Peoples' Util. Dist. v. Johnson, 735 F.2d 1101, 1116 (9th Cir.1984). Various federal acts require the BPA administrator periodically to revise rates to recover the capital costs and expenses associated with the Columbia River power system. 16 U.S.C. §§ 832f, 838g, 839e(a)(1) (1982). BPA is required to meet all interest and amortization payments owed to the United States Treasury for federal investments in BPA power and transmission systems. 16 U.S.C. §§ 839(4), 839e(a)(1).
 
 
 6
 BPA's combined generation and transmission facilities are known as the Federal Columbia River Power System. See 16 U.S.C. § 839a(10)(A). BPA also purchases energy from other utilities and accumulates it through conservation measures. Currently, BPA markets power generated at thirty federal hydroelectric projects and two nuclear plants, WPPSS Plant No. 2 and Trojan. The primary marketing area is the Pacific Northwest, comprised of the states of Washington, Oregon, and Idaho; Montana west of the Continental Divide; and the parts of Utah, Wyoming, and Nevada that are within the Columbia River drainage. 16 U.S.C. § 839a(14). BPA also markets power outside the Pacific Northwest, but only if it has the surplus energy to do so. 16 U.S.C. § 837a (1982). This energy is referred to as "nonfirm" energy, to distinguish it from the "firm" energy that BPA is required to provide to its Pacific Northwest customers first, pursuant to the Pacific Northwest Consumer Power Preference Act of 1964 (the Regional Preference Act), 16 U.S.C. §§ 837-837h (1982). Department of Water and Power of Los Angeles v. Bonneville Power Admin., 759 F.2d 684, 687 (9th Cir.1985).
 
 
 7
 BPA's energy system is planned around a hypothetical "critical water" supply, in which BPA measures its ability to meet the demand for power in the Pacific Northwest by assuming streamflows will be the worst on record and thermal generation and power purchases occur as planned. Nonfirm energy may result from streamflows in excess of critical, so long as reservoirs appear to be refilling on schedule. See, e.g., Central Lincoln, 735 F.2d at 1112. This planning method results in large amounts of nonfirm energy in most years. Consequently, BPA counts on nonfirm energy and makes decisions based on its availability.
 
 
 8
 BPA integrates hydroelectric energy production with other energy-producing resources. For example, when thermal resources are used to generate energy in the fall and early winter, the water that otherwise would have been used is stored behind the dams for later energy production. Therefore, BPA describes the reservoir as an "inventory" of energy, in which the quantity of water depends not only on streamflows, but on the use of thermal resources, power purchases, and conservation. Thus, electricity produced by dams may result from water whose energy content is attributable to the use of thermal or other resources, as well as to streamflow. According to BPA, it is impossible to attribute a unit of nonfirm energy to the resource that produced it, because the water supply is dependent on the use of several different resources. BPA operates the system not only to meet firm energy demands of the Pacific Northwest, but to maximize the amount of nonfirm energy produced.
 
 
 9
 While the NF-1 and 2 rates that BPA established were capped at cost, below-cost sales occurred to avoid wasting this surplus energy. According to BPA, California utilities saved $1.5 billion by buying electricity from BPA from July 1981 through October 1983, while at the same time BPA realized only $270 million in cumulative NF-1 and 2 revenues. BPA incurred revenue shortfalls in the years these rates were in effect, which resulted in missed interest and principal payments owed to the United States Treasury.
 
 Prior Proceedings
 
 10
 After lengthy formal evidentiary hearings, BPA proposed the NF-1 and 2 electric rates. In April of 1983, FERC consolidated its review of the NF-1 and 2 rates and set them for an evidentiary hearing before an administrative law judge (ALJ). United States Dept. of Energy--Bonneville Power Admin., 23 F.E.R.C. p 61,161, 61,354 (1983). All parties to the consolidated case before this court were represented at the FERC hearing.
 
 
 11
 The ALJ disapproved the NF-1 and 2 rates as not conforming to section 7(k) of the Regional Act. He stated:
 
 
 12
 The loser under the NF-1 and NF-2 rates has been BPA. The nonfirm customers were grossly undercharged for energy and this violated the fairness principle of cost allocations encompassed, in this case, within the "lowest possible rates to consumers consistent with sound business principles" requirement found in the statutory standards.... BPA came up short in revenue and could not pay on its federal debt and had its deferred interest payments increase.
 
 
 13
 29 F.E.R.C. p 63,039, 65,122 (1984). The parties filed exceptions to this ruling; therefore, the full Commission reviewed the NF-1 and 2 rates. See generally 18 C.F.R. §§ 385.708(d), 385.711 (1984) (sets forth procedures for review of an initial decision by the Commission).
 
 
 14
 In Opinion No. 250, the full Commission modified and reversed the decision of the ALJ in part, and approved and confirmed NF-1 and 2 rates precisely as BPA had originally filed them. U.S. Dep't of Energy--Bonneville Power Admin., 36 F.E.R.C. p 61,335 (1986). Rate determinations become final upon confirmation and approval by FERC. 16 U.S.C. § 839e(a)(2); Central Lincoln, 735 F.2d at 1105. In Opinion No. 250-A, the Commission denied a petition for a rehearing.
 
 
 15
 Except as modified or reversed, the Commission affirmed and adopted the ALJ's decision. The modifications of significance to this appeal are: (1) FERC eliminated a cap on the amount of thermal capacity costs included in the rates, 36 F.E.R.C. p 61,335, at 61,808; (2) FERC did not approve the inclusion of costs of the residential exchange program in the rates, id. at 61,800, 61,811-813;[2] and (3) FERC found BPA's failure to design nonfirm rates to recover its costs was not a basis for rejection of the rates. Id. at 61,817-19.
 
 
 16
 The Northwest and California parties timely petitioned for review of FERC's decision.
 
 STANDARD OF REVIEW
 
 17
 The Regional Act provides a specific standard of review for final determinations of electric rates. This court must affirm the rates if "substantial evidence in the rulemaking record" supports BPA's determination. 16 U.S.C. § 839f(e)(2); Central Lincoln, 735 F.2d at 1116. We must also affirm the agency's action unless it is arbitrary, capricious, an abuse of discretion, or in excess of statutory authority. 16 U.S.C. § 839f(e)(2); California Energy Resources Conservation and Dev. Comm'n v. Bonneville Power Admin., 831 F.2d 1467, 1472 (9th Cir.1987), cert. denied, --- U.S. ----, 109 S.Ct. 58, 102 L.Ed.2d 36 (1988).
 
 
 18
 We defer to the interpretation of a statute by the agencies charged with administering it. Southern Cal. Edison Co. v. FERC, 770 F.2d 779, 782 (9th Cir.1985). Because BPA drafted the Regional Act, its interpretation is to be given "great weight" and should be upheld if reasonable. Aluminum Co. of America v. Central Lincoln Peoples' Util. Dist., 467 U.S. 380, 389-90, 104 S.Ct. 2472, 2479, 81 L.Ed.2d 301 (1984); California Energy Resources Conservation and Dev. Comm'n v. Johnson, 807 F.2d 1456, 1459 (9th Cir.1986). In a complex ratemaking case such as this, we also defer to FERC's substantial expertise in approving and confirming BPA's rates. See Papago Tribal Util. Auth. v. FERC, 773 F.2d 1056, 1058 (9th Cir.1985) (deference given to FERC in ratemaking under the Federal Power Act, 16 U.S.C. §§ 824 et seq.), cert. denied, 475 U.S. 1108, 106 S.Ct. 1515, 89 L.Ed.2d 913 (1986). However, the courts are the final authorities on issues of statutory construction. They must reject administrative constructions of a statute that are inconsistent with the statutory mandate or that frustrate the policy Congress sought to implement. Southern Cal. Edison, 770 F.2d at 782.
 
 DISCUSSION
 
 19
 Whether the California Utilities Have Standing
 
 
 20
 BPA argues the California utilities do not have standing because they saved a windfall $1.5 billion by voluntarily purchasing BPA surplus energy. This contention is without merit. To have standing, a petitioner must show the challenged action caused them "injury in fact;" that the injury was within the "zone of interests" to be protected by the statutes that were allegedly violated, Starbuck v. City and County of San Francisco, 556 F.2d 450, 458 (9th Cir.1977) (citing Sierra Club v. Morton, 405 U.S. 727, 733, 92 S.Ct. 1361, 1365, 31 L.Ed.2d 636 (1972)), and that the relief sought would cure the injury. Id. at 458 (citing Warth v. Seldin, 422 U.S. 490, 505, 95 S.Ct. 2197, 2208, 45 L.Ed.2d 343 (1975); Simon v. Eastern Kentucky Welfare Rights Org., 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976)).
 
 
 21
 While BPA agrees the California utilities' claims are within the "zone of interests" to be protected by section 7(k) of the Regional Act, it claims the utilities lack standing because they failed to allege any injury. However, the California utilities do allege an injury: excessive electricity rates due to costs that should not have been included in the NF-1 and 2 rate schedules. There is harm in paying rates that may be excessive, no matter what the California utilities may have saved. Further, if the utilities are correct, the relief sought would cure their injury: they will receive a refund of overpayments with interest. 18 C.F.R. § 300.20(c)(2) (1984). Therefore, the utilities have standing.
 
 
 22
 Whether There Is A "Fair and Reasonable" Standard for Ratemaking
 
 
 23
 Section 7(k) requires BPA to establish nonfirm energy rates sold outside the Pacific Northwest in accordance with the Bonneville Project Act, 16 U.S.C. §§ 832-832l (1982), the Flood Control Act of 1944, 16 U.S.C. § 825s (1982), and the Federal Columbia River Transmission System Act, 16 U.S.C. §§ 838-838k (1982). 16 U.S.C. § 839e(k). These three Acts require that BPA rates for nonfirm energy be drawn:
 
 
 24
 1. having regard to the recovery of the cost of generation and transmission of such electric energy;
 
 
 25
 2. so as to encourage the most widespread use of Bonneville power;
 
 
 26
 3. to provide the lowest possible rates to consumers consistent with sound business principles; and
 
 
 27
 4. in a manner that protects the interests of the United States in amortizing its investments in the projects within a reasonable period.
 
 
 28
 Central Lincoln, 735 F.2d at 1114; see also Opinion No. 250, 36 F.E.R.C. p 61,335, at 61,798.
 
 
 29
 The California Energy Commission (CEC) contends there is a fifth ratemaking standard. The CEC states: "statutes embodied in Section 7(k) require first that BPA sell extraregional nonfirm energy 'on fair and reasonable terms and conditions.' " The CEC cites for support the Flood Control Act, 16 U.S.C. § 825s, and Opinion No. 250, 36 F.E.R.C. p 61,335, at 61,820 n. 20. BPA, on the other hand, contends that the Flood Control Act does not refer to ratemaking in section 825s,[3] but reflects Congress' desire to limit federal transmission capacity only to the extent that sales of federal power can be economic. BPA claims FERC does not say in Opinion No. 250 that "fair and reasonable" is a ratemaking standard, but only that it is part of FERC's inquiry on review of the NF-1 and 2 rates. See Opinion No. 250, 36 F.E.R.C. p 61,335, at 61,820 n. 20.[4]
 
 
 30
 The other California parties recognize the distinction BPA makes.[5] On reading section 825s, we agree that it does not refer to ratemaking per se, but rather to the overall requirement of fairness in the delivery of power by the BPA. BPA's interpretation is reasonable. Therefore, no "fair and reasonable" standard is applicable to ratemaking.
 
 
 31
 Whether FERC Could Hold An Evidentiary Hearing In Its Review Of The Nonfirm, Nonregional Rates
 
 
 32
 The Northwest parties contend FERC violated section 7(k) by failing to base its review of the NF-1 and 2 rates solely on the BPA administrative record. They claim arguments were raised and evidence was presented at the FERC hearing that were not before BPA when BPA decided the nonfirm rates.[6]
 
 
 33
 FERC claims that section 7(k) does not limit its review to the BPA record, but in the last sentence provides for an additional hearing, which must be given effect. FERC says it has discretion to decide what type of hearing is necessary, and that its interpretation is entitled to deference, because of its ultimate responsibility for administering section 7(k).[7]
 
 
 34
 In relevant part, section 7(k), 16 U.S.C. § 839e(k), states:
 
 
 35
 Notwithstanding any other provision of this chapter, all rates or rate schedules for the sale of nonfirm electric power within the United States, but outside the region, shall be established ... in accordance with the procedures of subsection (i) of this section.... [S]uch rates or rate schedules shall become effective after review by the Federal Energy Regulatory Commission for conformance with the requirements of such Acts and after approval thereof by the Commission. Such review shall be based on the record of proceedings established under subsection (i) of this section. The parties to such proceedings under subsection (i) of this section shall be afforded an opportunity by the Commission for an additional hearing in accordance with the procedures established for ratemaking by the Commission pursuant to the Federal Power Act [16 U.S.C.A. § 791a et seq.].
 
 
 36
 As we see it, there are four arguments against FERC's authority to hold a separate evidentiary hearing. First, subsection (i) describes the procedures the BPA Administrator must follow to establish rates. 16 U.S.C. § 839e(i). The subsection requires BPA to hold one or more hearings "to develop a full and complete record." 16 U.S.C. § 839e(i)(2). No party disputes that these hearings are to be evidentiary. See 16 U.S.C. §§ 839e(i)(2)(A), (B); 16 U.S.C. § 839e(i)(3). The rates are then proposed by BPA and published in the Federal Register, after which additional hearings subject to the same procedures may be held. 16 U.S.C. § 839e(i)(4). Then, the BPA Administrator makes a final decision based on the record, which "shall include a full and complete justification of the final rates...." 16 U.S.C. § 839e(i)(5). Therefore, section 7(k)'s statement that FERC review shall be based upon "the record of proceedings established under subsection (i) of this section" limits FERC review to the BPA record.
 
 
 37
 Second, this court's review is to be based solely on the BPA record. Section 839f(e)(2) of the Regional Act specifies that the scope of our review of "final determinations regarding rates under section 839e of this title shall be supported by substantial evidence in the rulemaking record required by section 839e(i) of this title considered as a whole." 16 U.S.C. § 839f(e)(2) (emphasis added). It would be anomalous for this court to consider another record established by FERC given this statutory mandate.
 
 
 38
 Third, to permit an evidentiary hearing is inconsistent with this court's precedent regarding FERC review as appellate in nature under 7(k):
 
 
 39
 A Federal Power Act rate case is a de novo proceeding ... in which FERC holds an evidentiary hearing and bases its decision solely on the record compiled at that hearing. 16 U.S.C. § 824d. FERC may accept, reject or modify the ... proposed rates. By contrast, a nonregional rate hearing is a form of appellate review, based on the record previously developed by the BPA in the administrative rate proceeding below. FERC may not modify the proposed rate; it may only confirm or reject it. Central Lincoln, 735 F.2d at 1113 n. 6; U.S. Secretary to Energy, Bonneville Power Administration, 13 F.E.R.C. p 61,157 at p. 61,339 (1980).
 
 
 40
 Southern Cal. Edison, 770 F.2d at 784 n. 3. Moreover, the Supreme Court has made the following observation about FERC's role in final approval and confirmation of the federal hydroelectric rates:
 
 
 41
 FERC views its role in this process as "in the nature of an appellate body," 45 Fed.Reg. 79545, 79547 (1980); its function is to determine from the record before it whether "due process requirements have been met and [whether] the Administrator's program of rate schedules and the decision of [the Assistant Secretary] are rationale and consistent with the statutory standards." Ibid. In exercising that appellate function, FERC relies on the record before it, remanding for supplementation if necessary.
 
 
 42
 United States v. City of Fulton, 475 U.S. 657, 663, 106 S.Ct. 1422, 1426, 89 L.Ed.2d 661 (1986). Although City of Fulton does not interpret section 7(k), but rather section 5 of the Flood Control Act of 1944, 16 U.S.C. § 825s, this decision provides some guidance on FERC's role in reviewing proposed rates. City of Fulton describes how hydroelectric rates are developed by the Power Marketing Administrations (PMAs)[8] and are then approved on an interim basis by the Assistant Secretary of Energy before final confirmation and approval by FERC. Id. at 662-63, 106 S.Ct. at 1425-26.
 
 
 43
 Finally, we note that according to section 7(k), FERC's function is to approve or disapprove the rates BPA sets; it may not impose other rates of its own. Central Lincoln, 735 F.2d at 1113 n. 6. Given this limitation, another evidentiary hearing seems superfluous.
 
 
 44
 On the other hand, a literal reading of the last sentence of section 7(k) appears to allow an evidentiary hearing before FERC, because the additional hearing section 7(k) provides for under the procedures of the Federal Power Act is a de novo proceeding in which FERC takes evidence. Southern Cal. Edison, 770 F.2d at 784 n. 3. However, this interpretation is at odds with the statement that FERC review "shall be based on the record of [the BPA proceedings]." 16 U.S.C. § 839e(k). It does not comport with FERC's limited role to approve and confirm BPA's rates, especially when it may lead to the introduction of evidence that BPA did not consider. A "basic rule of statutory construction is that one provision should not be interpreted in a way which is internally contradictory or that renders other provisions of the same statute inconsistent or meaningless." Hughes Air Corp. v. Public Util. Comm'n, 644 F.2d 1334, 1338 (9th Cir.1981).
 
 
 45
 FERC held the evidentiary hearing in this case because:
 
 
 46
 [W]e find that significant questions have been raised by the parties regarding whether these schedules meet the standards set forth in the applicable power marketing statutes. Based on the record presented, we cannot make a determination as to whether the revenue level proposed to be collected or the basis upon which the rate schedules have been designed is appropriate. We shall therefore set these matters for hearing.
 
 
 47
 U.S. Dep't of Energy--Bonneville Power Admin., 23 F.E.R.C. p 61,161, 61,354 (1983).
 
 
 48
 Both the Northwest parties and BPA opposed FERC's proposed evidentiary hearing.[9] In forceful arguments accusing FERC of making unsound policy, BPA maintained that: (1) section 7(k) requires FERC review to be based on the record of the BPA hearing; (2) section 7(k) does not mention a "hearing on the record" or legally require it; (3) redundant evidence delays Commission review; (4) the Federal Power Act does not require an evidentiary hearing; (5) the only reason to hold an evidentiary hearing would be if a party could demonstrate it was not provided with an opportunity to present its views in the BPA hearing; (6) FERC should defer to the BPA's interpretation of section 7(k) since BPA is the specialized agency Congress designated to establish rates; and (7) rather than holding evidentiary hearings, FERC should have requested briefing from the parties if it had trouble assessing BPA's 30,000 page administrative record.[10]
 
 
 49
 Although the Regional Act is no model of clarity, and the question is close and very difficult, we are persuaded that FERC should not have held this evidentiary hearing upon review of the nonfirm rates because FERC thought the BPA record was inadequate and wanted to supplement it. See 23 F.E.R.C. p 61,469, at 62,024. Congress designed the Act to prevent protracted legal challenges to BPA's ratemaking decisions. Central Lincoln, 735 F.2d at 1114. This objective is not served by multiple evidentiary hearings at different agencies. FERC's interpretation is unreasonable in light of the Act as a whole, because that interpretation renders meaningless the Regional Act's provisions for BPA to develop "a full and complete record," 16 U.S.C. § 839e(i)(2); for BPA to come to a final decision based on the record, which includes a complete justification for the rates, 16 U.S.C. § 839e(i)(5); and for FERC review and approval "based on the record of [BPA's] proceedings established under [16 U.S.C. § 839e(i) ]." 16 U.S.C. § 839e(k).[11]
 
 
 50
 Our interpretation will also prevent parties from sitting out the BPA hearings, as happened here, in contravention of the Regional Act. Moreover, this interpretation does not make insignificant the requirement that BPA develop a complete record for FERC review, or render meaningless the additional hearing before FERC provided for by section 7(k). See Hughes Air Corp., 644 F.2d at 1338; Ruiz v. Morton, 462 F.2d 818, 820 (9th Cir.1972) ("statutes are to be given, wherever possible, 'such effect that no clause, sentence or word is rendered superfluous, void, contradictory or insignificant' " (quoting Rockbridge v. Lincoln, 449 F.2d 567, 571 (9th Cir.1971)), aff'd, 415 U.S. 199, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974). It does not alter FERC's scope of review. We note that the House Committee Report on section 7(k) states that: "FERC's review will be based on the BPA record and on any subsequent FERC proceedings." H.R.Rep. No. 976, 96th Cong., 2d Sess., pt. 1, at 70 (1980), U.S.Code Cong. & Admin.News 1980, p. 5989. See 23 F.E.R.C. p 61,469, at 62,025 n. 2.
 
 
 51
 Although BPA argued that FERC may hold evidentiary hearings under section 7(k) only when a party can demonstrate it was not provided an opportunity to present its views adequately during the BPA hearing, we need not reach this issue. We decide here only that FERC may not hold an evidentiary hearing to supplement a record it thinks is inadequate. Our ruling does not mean, however, that an evidentiary hearing could not be held under other circumstances.
 
 
 52
 Since FERC's procedural error made its review overly broad, we need not remand, but proceed instead to the merits so that this legal challenge is not further protracted.
 
 
 53
 Whether BPA's Rates For Nonfirm Energy in the NF-1 and 2 Schedules Violate Section 7(k) of the Regional Act
 
 
 54
 To uphold FERC's decision, this court need not find that BPA's and FERC's construction of the relevant provisions of the Regional Act is the only reasonable construction, or that it is the one we would have adopted had construction been committed to the judiciary in the first instance. California Energy, 807 F.2d at 1459. The only requirement is that the agencies' interpretation of the Act be reasonable. Id.
 
 
 55
 Because this court must defer to FERC and the BPA in ratemaking cases, we must determine whether section 7(k), its legislative history, and the preexisting Acts whose ratemaking standards 7(k) incorporates prohibit the ratemaking decision that is challenged.[12] If not, the inquiry is whether the agencies' interpretation is a reasonable one, and if there is substantial evidence to support it. If so, the decision on the issue may be affirmed.
 
 
 56
 A. Whether The Nonfirm Rates To Nonregional Customers May Include The Full Cost of BPA's System
 
 
 57
 The main contention of the California parties is that BPA could not reasonably include its full capacity and energy costs in the NF-1 and 2 rates, and do so on an unweighted, proportional basis.
 
 
 58
 FERC determined it was undisputed that BPA operates its system to maximize the production of useful energy, 36 F.E.R.C. p 61,335, at 61,802, which more often than not results in the production of surplus energy that is sold to California.[13] FERC decided that the incremental cost of surplus energy, which is what the California parties want the rate based upon, is impossible to determine because water in the reservoirs that produces nonfirm energy results not just from stream inflow, but from the use of thermal generating plants and conservation as well. Thus, the actual source of a given unit of energy produced cannot be determined. FERC found that its precedent and considerations of equity supported nonregional, nonfirm energy purchasers contributing to BPA's overall costs, since they benefit from BPA's entire system. 36 F.E.R.C. p 61,335, at 61,802. FERC also observed that even if California purchasers have unequal access to BPA power, and subsequently claim it has less value to them, that fact does not affect what it costs BPA to produce the energy. Id. at 61,805.
 
 
 59
 The California parties present the same arguments on appeal that FERC has decided. They cite to nothing in the statute that requires the alternatives to BPA's cost allocation they propose, nor have they demonstrated that FERC's decisions were either unreasonable or were unsupported by evidence in the record. In light of section 7(k)'s mandate that rates be set with regard to the recovery of the cost of generation and transmission of electric energy, FERC's approval of BPA's decision to charge full costs to nonregional customers was reasonable and was amply supported by the record. Thus, the California parties may not complain that they are not getting the protection from BPA bias that section 7(k) was enacted to prevent. As long as an agency has considered all the relevant factors and has rationally exercised its discretion in deciding matters of law, there is no reason to disturb its conclusions. Pacific Gas and Elec. Co. v. FERC, 746 F.2d 1383, 1386 (9th Cir.1984).
 
 
 60
 We adopt FERC's findings and conclusions as our own on this issue, excluding, however, its conclusion that fish and wildlife costs are properly included in the nonfirm energy rates. See 36 F.E.R.C. p 61,335, at 61,810-11. This issue was not properly before FERC because it was raised for the first time at FERC's evidentiary hearing, and we have held that hearing was in violation of section 7(k).
 
 
 61
 B. Whether the Costs of the WPPSS Nuclear Plants Should Be Charged to Nonfirm Customers
 
 
 62
 The California utilities contend they should not be charged for a facility unless it is actually producing energy. They say FERC properly delineated this inquiry on review when it stated:
 
 
 63
 The question is whether the current costs at issue are sufficiently associated with the current production of energy marketed as nonfirm energy to purchasers outside the [Pacific Northwest] as to make it reasonable for BPA to include the costs....
 
 
 64
 Opinion No. 250, 36 FERC p 61,335, at 61,807 (emphasis added).
 
 
 65
 The California utilities read the phrase "current production" narrowly, contending that costs for the WPPSS plants, none of which produced energy during the time the rates were in effect, and two of which are now mothballed permanently, should not have been included in the rates since the plants did not produce energy during the rate period. The California utilities concede these costs may be included in nonfirm rates if the plants ever produce energy during a rate period at issue.
 
 
 66
 This argument was not new to FERC. In 1980, when the WPPSS plants were under construction, customers of BPA complained that charges related to BPA's prepayments on the WPPSS plants through debt financing should be deferred to a period contemporaneous with the commencement of service from these units. United States Sec'y of Energy, Bonneville Power Admin., 13 F.E.R.C. p 61,157, at 61,338 (1980). The WPPSS contracts required BPA to pay for its share of plant capacity on fixed dates whether or not the plants were completed or operating on those dates. Id. at 61,337. FERC decided the record supported a finding that the WPPSS costs were proper for inclusion in the rates to its customers in the Pacific Northwest and Pacific Southwest. Id. at 61,340. In the present case, FERC reiterated those reasons, which associate WPPSS costs with the current production of energy in the following manner:
 
 
 67
 The Commission has previously found that BPA is obligated by its contracts with WPPSS to make payments to WPPSS for those portions of the WPPSS system for which BPA is responsible. The Commission further found that it was proper for BPA to include these costs in current energy cost determinations to its customers because BPA is required by Department of Energy Order No. RA 6120.2 to pay its purchased power costs in the year in which they are incurred. The Commission found that BPA has no legal authority to borrow money with which to pay purchased power costs. Under these circumstances, the Commission found it was appropriate for BPA to include the WPPSS costs in current energy cost determinations as a means of providing sufficient revenue to BPA in order that it could meet its contractual obligations and in order to meet its statutory obligation to amortize Federal investment within a reasonable period of time. The Commission has therefore decided that it is appropriate to include BPA's WPPSS costs in the determination of BPA's current energy costs.
 
 
 68
 Opinion No. 250, 36 F.E.R.C. p 61,335, at 61,809 (citations to 13 F.E.R.C. p 61,157 omitted).
 
 
 69
 Significantly, the California utilities do not attack this specific statement. Instead, they reiterate their initial argument that there should be no charges for non-energy producing facilities.
 
 
 70
 FERC's rationale comports with the standards for ratemaking in section 7(k). FERC's primary concern during WPPSS construction and after plants 1 and 3 were terminated has been whether BPA could meet its statutory obligation to amortize Federal investment within a reasonable period of time. This concern is in keeping with FERC's role to insure the rates it confirms and approves satisfy the standards in the Acts enumerated in section 7(k). See infra p. 753; 13 F.E.R.C. 57 61,157, at 61,338 ("Under the federal powermarketing statutes, the Commission must determine that proposed rates would provide a sufficient level of revenues to BPA to recover its costs and repay the federal investment within a reasonable period of time."). If BPA has to pay WPPSS contract obligations, but cannot charge for them in its rates until the plants produce energy, it would have to divert revenue from funds that would otherwise go to repay the Treasury. Section 7(k) requires that rate schedules be structured to prevent such a result.
 
 
 71
 FERC decided nonfirm energy customers should share in the cost of WPPSS, because it found that BPA operates its entire system to maximize the production of useful energy, 36 F.E.R.C. p 61,335, at 61,802, 61,807, which benefits all BPA customers. This finding is supported by substantial evidence in the record. Further, there is substantial evidence that WPPSS plant capacities were acquired to serve nonfirm energy markets. BPA, 1982 Record of Decision at 118. Therefore, FERC decided the non-production of energy by the plants did not require a different allocation of costs between firm and nonfirm customers. Id. at 61,809-10.
 
 
 72
 BPA's and FERC's decision that WPPSS costs are to be borne by all customers is reasonable. A failure in planned energy production does not change the nature of a system designed to maximize energy production and use. Nothing in section 7(k) or the standards in the Acts it implements limit such a cost to firm customers only. It is a sound business principle to allocate the cost of the contractual obligations over the widest possible customer base to recover it within a reasonable time period. Further, FERC's designation of the WPPSS costs as an ancillary cost of doing business as a power producer is reasonable and is supported in the record.
 
 
 73
 The California utilities argue the Regional Act and its legislative history differentiate between regional and nonregional customers with respect to payment for non-production costs such as WPPSS. They argue that several provisions of the Regional Act specifically allocate to regional customers the costs of the Federal Base System resources, which include the WPPSS plants. They maintain there is no equivalent express allocation of these costs in section 7(k) for nonregional customers.
 
 
 74
 This argument fails because it ignores the standards section 7(k) incorporates from previous Acts that BPA must follow in designing its rates. These broad standards may reasonably be interpreted to allow for non-production costs in nonfirm energy rates, as previously discussed. The WPPSS costs are sufficiently associated with the current production of energy to make their inclusion in the nonfirm rates reasonable.
 
 
 75
 C. Whether The Costs of The Residential Exchange Program Should Be Included In The Nonfirm Rates
 
 
 76
 Under section 5(c) of the Regional Act, 16 U.S.C. § 839c(c), a residential exchange program is established, under which any Northwest utility with high system costs may sell power to BPA at their average system cost, then purchase from BPA an equal quantity of low cost federal power. The benefits to the participating utilities are to be passed on directly to residential customers. California Energy, 807 F.2d at 1460. The Northwest parties argue that costs associated with this program should be included in the nonfirm rates.
 
 
 77
 FERC determined that Congress wanted the costs of this subsidy to be borne by the direct service industrial customers. It found that although the Act itself did not specify which customers should share in the cost of the program, legislative history stated Congress' preference: "The loss in revenue to the Administrator is in effect returned by the higher direct service industry rates." 36 F.E.R.C. p 61,335, at 61,812 (quoting H.R.Rep. No. 96-976, pt. I, p. 29 (1980)). This court has also observed that "[t]he cost of this 'money-losing program' ... is largely borne by BPA's direct-service industrial customers." California Energy, 807 F.2d at 1460 (citing 16 U.S.C. § 839e(c)(1)). Therefore, we find that the costs of the residential exchange program are not to be assessed against nonfirm energy customers. We adopt FERC's findings and conclusions on this issue.
 
 
 78
 D. Whether BPA's Nonfirm Rates Were Designed In Contravention of The Regional Act, Because The Rates For Nonfirm Energy Were Too Low
 
 
 79
 Without question, the NF-1 and 2 rates did not recover the cost to produce the nonfirm energy sold to California. BPA capped the NF-1 and 2 rates at cost in the rate design, but also provided for sales below cost. Both BPA and FERC admit the nonfirm rates did not recover the cost of service.[14] However, the issue is whether the rates as designed, not the rates as collected, were appropriate under the Regional Act.
 
 
 80
 The Northwest parties contend the Regional Act mandates BPA to design rates in such a way as to recover its costs. They argue the rates should allow for above-cost rates to offset any sales that are below cost. Otherwise, they claim, the firm customers of BPA are forced to subsidize the nonfirm customers, because less is subtracted from total system costs to determine the firm customers' final share. The Northwest parties contend the Regional Act precludes firm customers from having to subsidize nonfirm customers by limiting firm rates to the cost of resources needed to serve their loads. See 16 U.S.C. § 839e(b)(1). The Northwest parties seek a declaration that section 7(k) requires BPA to recover its cost of service, market conditions permitting.
 
 
 81
 During FERC review, BPA claimed it did not know, when designing the NF-1 and 2 rates for the first time under the Regional Act, what the value of its energy would be to nonregional customers, or what competitors' prices might be. Consequently, BPA says it designed the rates to avoid the waste of nonfirm energy. While BPA admits it must design nonfirm rates with an eye to cost recovery, BPA maintains the Regional Act does not say how costs are to be allocated among customer groups.
 
 
 82
 The main issue is whether and to what extent the Regional Act and the Acts incorporated in 7(k) limit BPA's authority to design nonfirm energy rates that may lose money. The ALJ for FERC concluded that there "was no excuse for BPA not designing its nonfirm rates so as to recover the costs fairly allocated to nonfirm energy from nonfirm energy users." 29 F.E.R.C. p 63,039, at 65,113. He concluded that "[t]his failure was a violation of the statutory standard respecting 'the lowest possible rates to consumers consistent with sound business principles.' " Id.
 
 
 83
 FERC, however, disagreed. It found no evidence in the record to support that BPA knew with reasonable certainty when it designed the rates what maximum price California would be willing to pay. FERC said BPA "had to be concerned with establishing a rate that would allow it to market energy under conditions of uncertainty at times when the alternative to selling the energy was waste through spill." 36 F.E.R.C. p 61,335, at 61,818. FERC thought it reasonable for BPA to provide for below cost rates to use at times when BPA could not market or store the energy it had available. Id. FERC determined that BPA's rates were consistent with the statutory criteria. Id. At the same time, FERC refused to say that BPA was obligated to provide for rates above costs to assure that sales at below-cost rates would be offset. It thought such a requirement would be unreasonable "in light of the latitude in the statutory requirement that the rates be as low as possible consistent with sound business principles." Id.
 
 
 84
 The Regional Act does not set forth how BPA must design its rates to conform to the four standards it must follow, or how costs are to be allocated between regional and nonregional customers. In the absence of a clear legislative command, we must consider whether BPA's rates for nonfirm energy " 'represent[ ] a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute.' " City of Fulton, 475 U.S. at 667, 106 S.Ct. at 1428 (quoting Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 845, 104 S.Ct. 2778, 2783, 81 L.Ed.2d 694 (1984)). BPA has three conflicting obligations under the prior statutes that section 7(k) incorporates. First, it must protect consumers by ensuring that power is " 'sold at the lowest possible rates ... consistent with sound business principles.' " Id. 475 U.S. at 668, 106 S.Ct. at 1428 (quoting United States v. Tex-La Elec. Co-op, Inc., 693 F.2d 392, 399-400 (5th Cir.1982)). Second, BPA must "protect the public fisc by ensuring that federal hydroelectric programs recover their own costs and do not require subsidies from the federal treasury." Id. (citing the legislative history of the Bonneville Project Act). Third, BPA must encourage the most widespread use of energy. The Regional Act does not state that any one of these obligations is more important than the others.
 
 
 85
 Although the question is very difficult, particularly with hindsight, the NF-1 and 2 rates, as developed, appear to conform to the statutory boundaries. BPA operates its system to maximize the production of useful energy. Not knowing exactly what future market conditions would be when it designed the rates, BPA properly allowed for below-cost rates in conditions where energy might otherwise be wasted. FERC's conclusion is reasonable that the "widespread use" requirement provides BPA with wide latitude in designing nonfirm energy rates. That conclusion comports with this court's previous decision that this "widespread use" standard, which incorporates two of the four standards BPA must use, see infra p. 753, provides BPA with so much discretion that there is no law to apply. City of Santa Clara, Cal. v. Andrus, 572 F.2d 660, 668 (9th Cir.), cert. denied, 439 U.S. 859, 99 S.Ct. 177, 58 L.Ed.2d 167 (1978).
 
 
 86
 This brings the question of whether there is law to apply here to the four standards section 7(k) incorporates. This court has recognized there is "law to apply" if a specific statute limits the agency's discretion to act in the manner that is challenged. Id. at 666. The challenged action is BPA's setting rates at below cost, to encourage the most widespread use of its power. The remaining two standards limit BPA's discretion to do so, because they require BPA to also have regard for cost recovery and protect the interests of the United States. Consequently, there appears to be law to apply. This conclusion does not conflict with City of Santa Clara, because these two standards were not present in that case. BPA provided for cap rates at the full cost of production as well as below-cost rates in its rate design. This rate design comports with all the statutory requirements. Therefore, FERC's approval of the NF-1 and 2 rates as designed is affirmed.
 
 CONCLUSION
 
 87
 We hold that FERC abused its discretion by holding an evidentiary hearing under section 7(k), in view of the Regional Act's directive that FERC's review should be based on the BPA record, FERC's limited role to approve and confirm the rates, and FERC's role as described by the Supreme Court and this circuit.
 
 
 88
 On the merits of those issues properly before it, FERC's decision to approve the nonfirm energy rates as developed by BPA is AFFIRMED.
 
 
 
 [1]
 The Regional Act in its entirety is found at 16 U.S.C. § 839-839h (1982)
 
 
 [2]
 The residential exchange program provides that any Northwest utility with high system costs may sell power to BPA at their average system cost, then purchase from BPA an equal quantity of low cost federal power. The benefits are to be passed on directly to the residential customers. California Energy Resources Conservation and Dev. Comm'n v. Johnson, 807 F.2d 1456, 1460 (9th Cir.1986). The cost is borne by BPA's direct-service industrial customers. Id. (citing 16 U.S.C. § 839e(c)(1))
 
 
 [3]
 The Flood Control Act, 16 U.S.C. § 825s, states:
 Electric power and energy generated at reservoir projects under the control of the Department of the Army ... not required in the operation of such projects shall be delivered to the Secretary of Energy, who shall transmit and dispose of such power and energy in such manner as to encourage the most widespread use thereof at the lowest possible rates to consumers consistent with sound business principles.... Rate schedules shall be drawn having regard to the recovery ... of the cost of producing and transmitting such electric energy, including the amortization of the capital investment allocated to power over a reasonable period of years. Preference in the sale of such power and energy shall be given to public bodies and cooperatives. The Secretary of Energy is authorized ... to construct or acquire, by purchase or other agreement, only such transmission lines and related facilities as may be necessary ... to make the power and energy generated at said projects available in wholesale quantities for sale on fair and reasonable terms and conditions to facilities owned by the Federal Government, public bodies, cooperatives, and privately owned companies.
 (Emphasis added.)
 
 
 [4]
 In note 20, FERC states: "The Commission noted [in other hearings on rates] that the question of whether BPA had made power available to extraregional customers on fair and reasonable terms and conditions was part of the inquiry in reviewing extraregional rates."
 
 
 [5]
 "In addition [to the four standards enumerated above] for those rates to warrant approval [by FERC] BPA must make nonfirm energy available on 'fair and reasonable' terms and conditions." California Public Utilities Commission Opening Brief at 7
 "[FERC] has also specified that the nonregional rates it reviews under Section 7(k) must be 'fair and reasonable.' " California Utilities Opening Brief at 19.
 
 
 [6]
 As examples, the Northwest parties state the California utilities objected for the first time before FERC, and now contend before us, that fish and wildlife costs should not be included in the nonfirm rates. The Northwest parties also claim the California utilities agreed at the BPA rate case that BPA should adopt one nonfirm rate for all customers, but then told FERC that the law requires a special nonfirm rate for nonregional sales. Northwest Parties' Reply Brief at 11-12, n. 11
 
 
 [7]
 FERC has stated that evidentiary hearings will not necessarily be held in all section 7(k) proceedings, but rejects the contention that the language of section 7(k) does not permit them. See 23 F.E.R.C. p 61,469, at 62,024 (1983)
 
 
 [8]
 BPA is the "biggest and most important" of the five PMAs. United States v. Tex-La Elec. Co-op., Inc., 693 F.2d 392, 394 n. 3 (5th Cir.1982)
 
 
 [9]
 We note that BPA does not challenge this issue on appeal. But BPA points out in its brief that FERC review is "appellate in nature and must be based on BPA's record."
 
 
 [10]
 FERC responded "[t]here may be merit to BPA's argument that such an additional hearing need not be an evidentiary hearing and that the mandate of [section 7(k) ] may be fulfilled, instead, by providing the parties with the opportunity to file briefs of written comments." 23 F.E.R.C. p 61,469, 62,024 (1983). Nevertheless, FERC decided to hold an evidentiary hearing to supplement the record, attempting to avoid duplication of the BPA record. Id
 
 
 [11]
 The opinion FERC cites, Pacific Gas & Elec. Co. v. FERC, 746 F.2d 1383 (9th Cir.1984), to show that FERC has discretion to decide the type of hearing, is distinguishable. That case arose under the interpretation of a contract for transmission service, not under section 7(k)
 
 
 [12]
 Some parties argue that BPA is entitled to no deference. See, e.g., California Utilities Reply Brief at 10. Such a position does not comport with Supreme Court precedent or precedent in this circuit. See supra. p. 752
 
 
 [13]
 This power was sold cheaply under the rates in question, considering what the record shows the California parties would otherwise have paid
 
 
 [14]
 The full production costs for NF-2 energy was 18 mills/kWh, the set standard rate. The spill rate, used when energy supplies were abundant, was set at 9 mills/kWh, or half the cost of production. Under both the NF-1 and 2 rates, the California parties paid less than Northwest customers for BPA energy. Under the NF-1 rate, the California parties paid 7.7 mills/kWh, while Northwesterners paid 8 mills/kWh. Under the NF-2 rate, the California parties paid 9 mills/kWh, while Northwesterners paid 12 mills/kWh. As a result, the California parties saved $1.5 billion, while BPA realized only $270 million in cumulative NF-1 and 2 revenues. During these rate periods, BPA experienced overall revenue shortfalls in excess of $680 million, which caused BPA to miss interest and principal payments due the Treasury