**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PACIFIC NORTHWEST GENERATING
COOPERATIVE; BLACHY-LANE
COUNTY COOPERATIVE ELECTRIC
ASS.; CENTRAL ELECTRIC
COOPERATIVE INC.; CLEARWATER
POWER COMPANY; CONSUMERS
POWER INC.; COOS-CURRY ELECTRIC
COOP., INC.; DOUGLAS ELECTRIC
COOPERATIVE; FALL RIVER RURAL
ELECTRIC COOPERATIVE, INC.; LANE
ELECTRIC COOPERATIVE INC.; LOST
RIVER ELECTRIC COOPERATIVE INC.;
NORTHERN LIGHTS INC.; OKANOGAN
COUNTY ELECTRIC COOPERATIVE
INC.; RAFT RIVER RURAL ELECTRIC          No. 09-70228
COOPERATIVE, INC.; SALMON RIVER           BPA No.
ELECTRIC COOPERATIVE INC.;              06-PB-11744
UMATILLA ELECTRIC; WEST OREGON
ELECTRIC COOPERATIVE INC.,
                            *Petitioners,*

ALCOA, INC.; AVISTA CORPORATION;
PUGET SOUND ENERGY, INC.;
PACIFICORP; IDAHO POWER
COMPANY; COLUMBIA FALLS
ALUMINUM COMPANY, LLC,
                            *Intervenors,*

                   v.

BONNEVILLE POWER
ADMINISTRATION; DEPT. OF ENERGY,
                            *Respondents.*

3269

PUBLIC POWER COUNCIL,

*Petitioner,*

AVISTA CORPORATION; PUGET SOUND
ENERGY, INC.; IDAHO POWER
COMPANY; ALCOA, INC.; COLUMBIA
FALLS ALUMINUM COMPANY, LLC,

*Intervenors,*

v.

BONNEVILLE POWER
ADMINISTRATION; DEPARTMENT OF
ENERGY,

*Respondents.*

No. 09-70236

BPA
No. 06-PB-11744

INDUSTRIAL CUSTOMERS OF
NORTHWEST UTILITIES,

*Petitioner,*

v.

BONNEVILLE POWER
ADMINISTRATION,

*Respondent.*

No. 09-70988

BPA
No. 06-PB-11744

ORDER
AMENDING
OPINION AND
AMENDED
OPINION

On Petition for Review of an Order of the
Bonneville Power Administration

Argued and Submitted
July 7, 2009—Seattle, Washington

Filed August 28, 2009
Amended March 2, 2010

Before: Raymond C. Fisher and Marsha S. Berzon,
Circuit Judges, and Barry Ted Moskowitz, * District Judge.

Opinion by Judge Berzon

*The Honorable Barry Ted Moskowitz, District Judge for the Southern
District of California, sitting by designation.

**COUNSEL**

Erick Johnson, Lake Oswego, Oregon, for petitioner Pacific Northwest Generating Cooperative.

Mark R. Thompson, Portland, Oregon, for petitioner Public Power Council.

Melinda J. Davison, Irion Sanger, Davison Van Cleve, P.C., Portland, Oregon, for petitioner Industrial Customers of Northwest Utilities.

Karin J. Immergut, United States Attorney; Stephen J. Odell, Assistant United States Attorney; David J. Adler, J. Courtney Olive, Special Assistant United States Attorneys; Randy A. Roach, General Counsel; Timothy A. Johnson, Assistant General Counsel, Portland, Oregon, for respondent Bonneville Power Administration.

Michael J. Uda, Doney Crowley Bloomquist Payne Uda P.C., Helena, Montana, for intervenor Columbia Falls Aluminum Company.

Michael C. Dotten, Lake Oswego, Oregon, for intervenor Alcoa Inc.

Jay T. Waldron, William J. Ohle, Sara Kobak, Schwabe Williamson & Wyatt P.C., Portland, Oregon, for intervenors PacifiCorp *et al.*

## ORDER

The opinion filed on August 28, 2009, and reported at 580 F.3d 828, is amended. The amended opinion filed concurrently with this order is substituted in its place.

With the filing of the amended opinion, the panel has unanimously voted to deny the petitions for panel rehearing. Judges Fisher and Berzon have voted to deny the petition for rehearing en banc, and Judge Moskowitz so recommends. The full court has been advised of the petition for rehearing en banc, and no judge of the court has requested a vote on the petition for rehearing en banc. Fed. R. App. P. 35(f).

The petitions for rehearing and the petition for rehearing en banc are DENIED. No further petitions for rehearing or rehearing en banc may be filed.

## OPINION

BERZON, Circuit Judge:

In *Pacific Northwest Generating Coop. v. Dep't of Energy ("PNGC")*, 550 F.3d 846 (9th Cir. 2008), *amended on denial of reh'g*, No. 05-75638, 2009 WL 2386294 (9th Cir. Aug. 5, 2009), this court held invalid a central provision of a five-year contract between the Bonneville Power Administration ("BPA") and the aluminum company Alcoa, Inc. ("Alcoa").

Less than a month after we issued the *PNGC* opinion, BPA announced that it and Alcoa had agreed to an amended version of the invalidated provision that would govern the nine-month period ending September 30, 2009 (the original five-year contract would have expired in September 2011). Petitioners Pacific Northwest Generating Cooperative ("PNGC"), Public Power Council ("PPC"), and Industrial Customers of Northwest Utilities ("ICNU") challenge BPA's decision to execute the amended contract.

We agree with the petitioners' challenge and therefore grant their petitions for review. Although under no obligation to contract with Alcoa, BPA agreed voluntarily to make a nearly $32 million cash "benefit" payment to the aluminum company, so that the company could purchase power from one of BPA's competitors. BPA's justifications for this unusual transaction, under which the agency received nothing directly in exchange for its $32 million, do not demonstrate that the transaction was "consistent with sound business principles," as required by BPA's governing statutes. We therefore hold that BPA exceeded its statutory authority when it agreed to the Alcoa contract amendment.

## I.  BACKGROUND

### A.  The *PNGC* Opinion

In *PNGC*, we invalidated a central provision of a five-year contract (the "2007 Contract") between the Bonneville Power Administration and Alcoa, one of BPA's Direct Service Industrial ("DSI") customers. Under the invalidated provision, BPA had agreed to "sell" power to Alcoa at a mutually agreed-upon rate, below both the market rate and the statutorily authorized Industrial Firm Power (IP) rate. *See PNGC*, 550 F.3d at 854-58. The provision at issue did not, however, require BPA to sell physical power to Alcoa. Rather, BPA had agreed to "monetize" the power sale by making cash "benefit" payments to Alcoa in an amount approximately equal to the

difference between the higher wholesale market rate for power and the lower contract rate multiplied by the amount of power consumed by Alcoa each month.[1] *See id.* at 854-55. The idea was that Alcoa could use the monetary benefit payments to subsidize its purchase of power on the wholesale market, such that the aluminum company's net power costs would be approximately equal to the agreed-upon contract rate (assuming that various caps on the monetary benefit were not triggered). *See id.*

We held this monetization provision invalid on the ground that "[t]he decision to monetize embodied in the agreements violated [BPA's] statutory obligation[ ] . . . to provide 'the lowest possible rates to consumers consistent with sound business principles.' § 838g." *Id.* at 875. We explained:

> In essence, BPA has voluntarily agreed to forgo revenues by charging the DSIs a rate below what is authorized by statute (i.e., the IP rate) and below what is available on the open market. These foregone revenues result in higher rates for all other customers. This outcome is in apparent and direct conflict with BPA's statutory mandate, *see* § 838g, and renders BPA's decision to "monetize" the DSI contracts in an amount reflective of those underlying rate decisions — albeit a capped amount — highly suspect.

*Id.*

We then considered and rejected as "flawed" BPA's three

---

[1]The monetary benefit payments in the 2007 Contract were subject to several caps. For example, BPA agreed to pay no more than $24/MWh for each MWh of power that Alcoa consumed. Thus, if the wholesale rate for power exceeded the agreed-upon rate by more than $24/MWh, Alcoa was required to pay the overage. For a more thorough discussion of the various caps and relevant examples, *see PNGC*, 550 F.3d at 855 & n.11.

proffered justifications for this decision. *Id.* at 875-78. In so doing, we noted that "[b]y subsidizing the DSIs' smelter operations beyond what it is obligated to do, BPA is simply giving away money," *id.* at 877, and that such an act was "not reflective of a 'business-oriented philosophy,'" *id.* at 878 (quoting *Ass'n of Pub. Agency Customers, Inc. v. BPA ("APAC")*, 126 F.3d 1158, 1171 (9th Cir. 1997)). We also explained that "BPA's authority to *sell* power to the DSIs does not mean that BPA may simply *give* money to the DSIs by calling the agreement a 'power sale' with 'monetized service benefits.'" *PNGC*, 550 F.3d at 878 (emphasis in original).

We concluded our discussion of the validity of the monetary benefit provision of the 2007 Contract with the following summary:

> In sum, BPA has not advanced a "reasonable interpretation[ ] of its governing statutes" that supports its actions. *Golden Nw. Aluminum* [*Inc. v. BPA*, 501 F.3d 1037, 1045 (9th Cir. 2007)]. Nor has the agency shown how offering the DSIs rates below the market rate and below what it is statutorily authorized to offer "further[s] BPA's business interests consistent with its public mission." *Ass'n of Pub. Agency Customers*, 126 F.3d at 1171. We conclude that BPA's decision to offer the subsidized rates to the DSIs and then monetize those rates is inconsistent with BPA's statutory authority under the NWPA, and therefore hold that the monetization provisions of the aluminum contracts are invalid.

*Id.*

The *PNGC* opinion was filed on December 17, 2008. Two weeks later, on December 31, 2008, BPA sent a letter to its regional customers and stakeholders, including Petitioners. In the letter, BPA informed its customers that, in light of the

*PNGC* opinion, the agency would cease making monetary benefit payments to Alcoa.

The agency also announced a proposed amendment to the 2007 Contract "so that service thereunder will conform to the [*PNGC*] Opinion." The critical change that BPA proposed was that the parties would begin using the IP rate as the basis for the monetary benefit calculation, rather than the previous contract rate (which, as noted, was below the IP rate). BPA also informed its customers that the amendment would only govern "sales" to Alcoa from January 1, 2009 through September 30, 2009.

BPA concluded its letter by providing a web address where interested parties could view the proposed amended contract. The agency also stated that it would accept public comments about the amendment until January 6, 2009, less than a week later. Although it recognized that it was providing only "a limited time to comment on the proposed amendment," the agency stated that it "believe[d] that it is important to implement this amendment in a timely manner to avoid, if possible, any unnecessary interruption of smelter operations, especially given the difficult economic times and potential loss of additional jobs in the region."

## B.    The Amended Contract

On January 9, 2009, BPA signed the amended contract. Like the 2007 Contract, the amended contract did not require BPA to deliver physical power to Alcoa. Instead, BPA once again agreed to provide a "monetary benefit" to Alcoa, which Alcoa could then use to offset the cost of purchasing physical power on the open market.

Unlike under the previous contract, however, the monetary benefit in the amended contract is calculated using the IP rate as the base rate, rather than an agreed-upon rate lower than the IP rate. More specifically, BPA agreed in the amended

contract to pay Alcoa the difference between a forecasted market rate for power of $48.05/MWh and the IP rate of $32.70/MWh — that is, $15.35/MWh — for every megawatt hour of power purchased by Alcoa on the open market between January 1, 2009 and September 30, 2009, up to a total of $31.9 million.[2]

BPA announced the execution of the amended contract in a letter to its customers dated January 13, 2009. In the letter, BPA explained the reasons for its decision to enter into the amended agreement:

> BPA decided it was necessary to move quickly to implement the amendment and avoid, if possible, any unnecessary interruption of smelter operations, especially given the difficult economic times and potential loss of additional jobs. Alcoa's announcement of substantial worldwide layoffs and [Columbia Falls Aluminum Company's] announcement of a likely plant closure reinforced our view that it was important to act quickly. As a consequence, a limited amount of time was available for public comment. While we would have preferred to afford customers more time to comment on the proposed amendment, BPA believed it had to move quickly due to the circumstances.
>
> . . .
>
> This amendment is an interim action that applies to payments through FY 2009 only. We now have time to address the FY 2010-11 period under the 2007 Block Contract, and will use that time to more thoroughly engage with the public on the terms for any

---

[2]The IP rate quoted in *PNGC* was $45.08/MWh. *See PNGC*, 550 F.3d at 857. That rate was for FY2007. The adjusted FY2009 rate is $32.70//MWh. Petitioners do not dispute the validity of the 2009 IP rate.

amendment or replacement agreement for the FY 2010-11 period.

BPA understands that it must address the look-back issue associated with payments made under the 2007 Block Contract during the FY 2007-2008 period, and intends to engage the region once we have an opportunity to consider all these arrangements more thoroughly.

Two months later, on March 3, 2009, BPA announced that it had executed a nearly identical amendment to its contract with a second aluminum DSI, Columbia Falls Aluminum Company (CFAC). The validity of the amended CFAC contract is not part of this appeal. The announcement of the CFAC deal is relevant, however, because in that announcement, BPA provided more detailed explanations of its reasons for entering into the Alcoa contract amendment. Those reasons included the fact that "DSI loads have historically benefitted BPA by taking power in relatively flat blocks that require little or no shaping; they have taken power from BPA at light load hours, when power has historically been difficult to market; and they have provided the Administrator with additional power reserves." The agency also averred that "changing technologies in the aluminum and power industries may permit DSI smelters to provide value to BPA in ways that have not yet been imagined." Thus, the agency concluded, it would be "unwise and imprudent . . . to refuse to provide service to customers that may provide future value to BPA as they have done in the past." BPA also expressed concern about the short-term impact of a refusal to execute the amended agreement, stating that the "DSIs currently have no viable alternative for its power needs and a decision not to sell power to DSIs would almost surely have the immediate consequence of the plants shutting down and perhaps never resuming production."

Finally, the agency acknowledged that the monetary benefits offered to Alcoa and CFAC would result in an increase in

rates for its other customers. It nonetheless concluded that the contracts were reasonable because the agency did "not believe that the proposed amendment, which covers only a nine month period at a relatively modest cost, causes unreasonable upward pressure on rates."

## C.   The Current Petitions

Petitioners PNGC, PPC, and ICNU filed petitions challenging the validity of the amended contracts on January 22, 2009, January 23, 2009, and April 6, 2009, respectively. The petitions were consolidated on April 21, 2009, and are the basis of the current appeal.

## II.    Standard of Review

We affirm BPA's actions unless they are "arbitrary, capricious, an abuse of discretion, or in excess of statutory authority." *PNGC*, 550 F.3d at 860 (quoting *Aluminum Co. of America v. BPA*, 903 F.2d 585, 590 (9th Cir. 1989)). "In determining whether BPA has acted in accordance with law, we defer to BPA's reasonable interpretations of its governing statutes. *Golden Nw. Alum. v. BPA*, 501 F.3d 1037, 1045 (9th Cir. 2007); *see also PNGC*, 550 F.3d at 861.

## III.   Analysis

Petitioners maintain that by entering into the amended Alcoa contract, BPA acted in contravention of its statutory obligation to provide "the lowest possible rates to consumers consistent with sound business principles." In essence, the Petitioners argue that BPA's decision to enter into a money-losing contract that required it to pay up to $31.8 million to a customer the agency was not obligated to serve "is not a transaction that a rational business would enter." The Petitioners further assert that BPA's proffered justifications for the decision once again fail to establish that the decision was reasonable.

BPA defends the validity of the amended contract on three grounds. First, the agency contends that it "has no independent obligation under PNGC to demonstrate that a sale of power (or monetization of a sale of power) to the DSIs *at the IP rate* must also satisfy the sound business principles standard." (Emphasis in original.) In BPA's view, so long as it offers Alcoa power (or its monetary equivalent) at the IP rate, it has acted within its statutory authority and complied with this court's holding in *PNGC*. Second, BPA maintains that the "sound business principles" standard is "so suffused with discretion that it cannot supply a basis for a justiciable federal claim because it provides 'no law to apply.' " In other words, according to BPA, even if the agency has an independent statutory obligation to act in accordance with sound business principles, any decision it makes pursuant to that obligation is not reviewable. Finally, BPA asserts that, assuming its decision to enter into the amended contract is reviewable under the sound business principles standard, the decision comports with such principles. We address each of these arguments in turn.

### A.  BPA has an independent obligation to act in a manner consistent with sound business principles.

BPA's argument that it need not independently demonstrate that its decision to sell power to Alcoa at the IP rate was "consistent with sound business principles" hinges on this panel's repeated references in *PNGC* to the agency's improper decision to monetize the sale of power to the DSIs at a "rate below what is authorized by statute (i.e., the IP rate) and below what is available on the open market." *See PNGC*, 550 F.3d at 875. BPA cites the following sentence as particularly clear evidence of this court's "narrow and straightforward" holding:

> Because, by its own admission, BPA is not obligated to sell power to the DSIs, its decision to sell power voluntarily at a rate below what it is statutorily

required to offer (i.e., the IP rate) and below what it could receive on the open market violates its statutory mandate to act in accordance with "sound business principles." *See* § 838g.

*Id.* at 873-74. According to BPA, this statement indicates that, had it used a rate that was equal to the IP rate or the market rate in the 2007 Contract, it would, by definition, not have violated its statutory mandate to act in accordance with "sound business principles." In short, BPA views its decision to premise its "benefits" to Alcoa on the IP rate as a kind of safe harbor that insulates it from a challenge that its decision to enter into the amended contract was not consistent with "sound business principles."

**[1]** BPA's interpretation of *PNGC* ignores critical aspects of that opinion and is therefore incorrect. First, the panel in *PNGC* agreed with BPA that it has no statutory obligation to sell power to Alcoa. *See id.* at 866. Second, the court in *PNGC* concluded, and BPA in that case acknowledged, that the agency is subject to a statutory obligation to act in accordance "with sound business principles." *See id.* at 875. Other panels have similarly recognized that BPA is required by statute "to operate with a business-oriented philosophy" and have reviewed BPA's compliance with this standard. *See, e.g.*, *Public Power Council, Inc. v. BPA*, 442 F.3d 1204 (9th Cir. 2006); *APAC*, 126 F.3d at 1171; *Dep't of Water & Power of the City of Los Angeles v. BPA*, 759 F.2d 684, 693 (9th Cir. 1985); *see also Portland Gen. Elec. Co. v. BPA*, 501 F.3d 1009, 1029 (9th Cir. 2007) (noting that BPA is "charg[ed] to function as a business.").**³**

**[2]** Given that BPA is not obligated to sell to the DSIs and

---

**³**We explain in Part III.B *infra*, why the "consistent with sound business principles" standard provides adequate law for a reviewing court to apply, and also conclude, contrary to BPA's submission, that no prior case has held otherwise.

that its actions are generally reviewable under the "sound business principles" standard, it follows that a decision by BPA to enter into a contract with a DSI, like other non-obligatory contractual decisions made by the agency, *see APAC*, 126 F.3d at 1171, must also conform to the "sound business principles" standard. BPA would surely have to consider the fact that it must offer DSIs the IP rate when deciding whether to execute a contract with the DSIs. *See PNGC*, 550 F.3d at 861 (holding that "if the agency chooses to offer firm power to the DSIs, . . . it must first offer them the IP rate."). But the fact that the agency entered into a contract at the IP rate does not insulate from review its voluntary decision to enter into the contract in the first place.

**[3]** To put it slightly differently, BPA is certainly authorized to sell power to the DSIs at the IP rate. *See PNGC*, 550 F.3d at 867-73. But that authority, like its authority to enter into contracts generally, is cabined by its obligation to "operate with a business-oriented philosophy." *APAC*, 126 F.3d at 1169-71 (reviewing BPA's decision to enter into "Long-Term Extension Agreements" with the DSIs for the sale of unbundled transmission services); *see also PNGC*, 550 F.3d at 878 ("BPA's authority to sell power to the DSIs does not mean that BPA may simply give money to the DSIs by calling the agreement a 'power sale' with 'monetized service benefits.' " (emphasis omitted)).

Intervenor CFAC, another aluminum DSI, argues that this interpretation of BPA's governing statutes would render the IP rate a nullity, because it would never make business sense for BPA to sell to the DSIs at the IP rate when market rates exceed the IP rate, and DSIs would never accept the IP rate when market rates fall below the IP rate. We disagree.

We can envision several situations in which BPA might reasonably conclude that a below-market rate sale to the DSIs is a sound business decision. First, as the court alluded to in *PNGC*, BPA's governing statutes likely require it to offer

power within the Pacific Northwest at established rates before the agency may sell power outside the region. *See PNGC*, 550 F.3d at 876 n.35.[4] If so, BPA might reasonably enter into a contract with the DSIs at the IP rate so as to "free up power to sell outside the Pacific Northwest." *Id.*

Second, BPA has asserted that the *physical* sale of power to the DSIs has indirect benefits that might offset a below-market rate sale. For example, BPA noted in its letter explaining its justifications for the amended contract with CFAC that "DSI loads have historically benefitted BPA by taking power in relatively flat blocks that require little or no shaping; they have taken power from BPA at light load hours, when power has historically been difficult to market; and they have provided the Administrator with additional power reserves." These and other non-financial benefits to BPA could very well justify a less-than-market rate sale, but they have no direct application when, as here, BPA is not in fact physically selling power to the DSIs.

Third, a soundly run business might reasonably offer a large customer a short-term discount with the expectation that the customer's future business at higher prices will more than make up for the short-term loss of revenue. Similarly, a reasonable business might offer a short-term discount to a customer in order to diversify its customer base or to offload unused capacity.

As these examples illustrate — and they are only examples, not meant to be exhaustive — a decision by BPA to enter into a power sale contract with the DSIs at the IP rate, even if the IP rate is below market rates, could under various circumstances be consistent with sound business principles.[5] As

---

[4]Because the issue is again not before us, we adopt no holding concerning whether BPA's governing statutes do, in fact, require it to offer power inside the region at established rates before it may sell power outside the region.

[5]If BPA can demonstrate that the decision to sell power to the DSIs at the IP rate is a sound business one, even where such a sale would require

explained below, however, although we review such a decision by BPA with great deference, *see APAC*, 126 F.3d at 1171, the decision must still be reasonable and have some support in the record before the agency at the time the decision is made.

**[4]** In sum, we hold that BPA's voluntary decision to contract with the DSIs, like its other non-obligatory contractual choices, must conform to the congressionally imposed requirement that the agency act in a manner "consistent with sound business principles." *See* 16 U.S.C. §§ 838g; 839e(a)(1); 825s. The mere fact that BPA has chosen to contract with a DSI at the statutorily authorized IP rate does not insulate the decision to contract from review under the "sound business principles" standard.[6]

## B. The "sound business principles" standard provides adequate law to apply.

BPA next argues that even if its decision to contract with

BPA to incur a short-term loss (either in the form of higher costs or foregone revenues), then the decision to monetize that contract may well be a sound business decision for the reasons discussed in *PNGC. See* 550 F.3d at 874-75 (noting, among other things, that "monetization reduces [BPA's] financial costs because it circumvents the risk that a customer will default on payment after power is physically delivered"). There are, of course, situations in which the decision to monetize would undermine the validity of BPA's decision to contract with the DSIs. For example, if, as here, BPA justifies the underlying sale by citing to benefits that would accrue to the agency only from the physical sale of power, then the decision to monetize rather than sell power would likely undercut that justification.

[6]In neither *PNGC* nor this case did BPA attempt to sell power to the DSIs at a market rate above the IP rate. We do not decide, nor have we decided, whether BPA could offer power to the DSIs at a rate above the IP rate if the agency could demonstrate that offering power to the DSIs at the IP rate was not consistent with sound business principles. *See PNGC*, 550 F.3d at 861.

Alcoa is subject to the "sound business principles" standard, that standard is "so suffused with discretion" that it provides "no law to apply" and cannot form the basis of our review.[7] In forwarding this position, BPA relies on *City of Santa Clara v. Andrus*, 572 F.2d 660 (9th Cir. 1978), and *Aluminum Co. of America v. BPA ("Alcoa")*, 903 F.2d 585 (9th Cir. 1989), cases that BPA claims definitively ruled that judicial review cannot be premised on the "sound business principles" standard.

Although we fully acknowledge that actions taken by BPA in furtherance of its business interests are entitled to particular deference, *see PNGC*, 550 F.3d at 860-61, we reject BPA's argument that such decisions are unreviewable, for several reasons.

[5] First, BPA's contention that its business decisions are entirely unreviewable is directly at odds with this court's precedent, as well as with a Supreme Court case, *United States v. City of Fulton*, 475 U.S. 657 (1986). As already noted, we have, on multiple occasions, held that actions taken by BPA in furtherance of its business interests, while owed significant deference, are nonetheless reviewable. *See PNGC*, 550 F.3d at 861, 877-78; *APAC*, 126 F.3d at 1171; *Public Power Council*, 442 F.3d at 1204; *Bell v. BPA*, 340 F.3d 945, 948-49 (9th Cir. 2003); *Dep't of Water & Power*, 759 F.2d at 693.

In *APAC*, for example, BPA asserted that its decision to begin "wheeling" non-federal power was a valid exercise of its "broad [statutory] authority to contract in [its] best busi-

---

[7]The Administrative Procedure Act, which governs our review of BPA's actions, *see* 16 U.S.C. § 839f(e)(2), prohibits judicial review of "agency action[s that are] committed to agency discretion by law." 5 U.S.C. § 701(a)(2). An agency action is "committed to [its] discretion by law" where a "statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion" — i.e., where it is "drawn in such broad terms that in a given case there is no law to apply." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985).

ness interests." *APAC*, 126 F.3d at 1169. In evaluating this argument, the court noted that "[t]he statutes governing BPA's operations are permeated with references to the 'sound business principles' Congress desired the Administrator to use in discharging his duties." *Id.* at 1171. In the court's view, these references provided BPA with "an unusually expansive mandate to operate with a business-oriented philosophy." *Id.* This "unusually expansive mandate" did not, however, preclude the court from reviewing the agency's decision for reasonableness. *See id.* After performing this review, the court concluded that the BPA's decision to begin wheeling non-federal power, a decision that was intended to increase BPA's competitiveness in a recently deregulated market, "appear[ed] reasonable" and was therefore entitled to deference. *See id.* at 1171.

In *PNGC*, BPA likewise argued that its decision to provide cash payments to the DSIs furthered its statutory mandate to operate in accordance with "sound business principles." *See PNGC*, 550 F.3d at 877-78. As in *APAC*, we noted that this court is "particularly deferential" to BPA when the agency acts in furtherance of its business interests. *Id.* at 861. We nonetheless held that BPA's conclusion that a specific action was consistent with "sound business principles" was reviewable for reasonableness. *See id.*

BPA's assertion that the "sound business principles" standard is too vague to support review is also undermined by our decision in *Public Power Council*. In that case, we expressly relied on the "sound business principles" standard to review a decision by BPA to revise upward its previously approved wholesale power rates. *Public Power Council*, 442 F.3d at 1209-11. Ultimately, we concluded that "[i]n light of [the] eximious reasons for BPA's [acting] in the way it did, we are not able to say that BPA failed to proceed in accordance with 'sound business principles.'" *Id.* at 1210. Although we affirmed BPA's actions in *Public Power Council*, our holding clearly indicates that we did not find the "sound business prin-

ciples" standard too indeterminate to support any review, however deferential.

Finally, in *Bell*, we reviewed BPA's decision to buy out its contractual obligations to supply suddenly high-cost power to DSIs at uneconomically low prices during a recent energy crisis. *See Bell*, 340 F.3d at 948-49. The court concluded that "BPA's decision to amend its contract obligations was eminently businesslike, given the probably devastating result of performing the original contract . . . ." *Id.* at 949. The court therefore refused to "second-guess the wisdom of BPA's winning business decision[ ], especially when it was responding to unprecedented market changes." *Id.* Implicit in this holding, however, is an assumption that the court would "second-guess" an action by BPA that was not "eminently businesslike." *See also Dep't of Water*, 759 F.2d at 693 (citing 16 U.S.C. § 839e(a)(1)'s requirement that rates "be designed consistent with sound business principles" and holding that, as a result of this and other legislative requirements, a decision by BPA to implement a policy designed to mitigate revenue shortfalls was "not only statutorily authorized but statutorily mandated").

**[6]** As these cases demonstrate, the law of this circuit is clear: when Congress imposed a duty on BPA to operate in accordance with "sound business principles," *see APAC*, 126 F.3d at 1171, it imposed a requirement that was capable of supporting review.

Our approach in all these cases, like our holding in this case, is consistent with the Supreme Court's approach in *City of Fulton* to review under a different statute containing "sound business principles" language. In *City of Fulton*, the Supreme Court held that Section 5 of the Flood Control Act imposed a statutory obligation on the Secretary of Energy to "protect consumers by ensuring that power is sold 'at the lowest possible rates . . . consistent with sound business principles.' " 475 U.S. at 667-68 (quoting *United States v. Tex-La*

*Elec. Cooperative, Inc.*, 693 F.2d 392, 399-400 (5th Cir. 1982)). The Court then reviewed an action by the Secretary for consistency with that standard, ultimately affirming the Secretary's action on the ground that the action was "reasonable" and "well suited" to meeting this obligation. *See id.* at 668. So, the Supreme Court, too, has recognized that "consistent with sound business principles" language provides a reviewable standard.

**[7]** Second, precedent aside, there is no basis for concluding that this is one of the "rare instances" where a statute is "drawn in such broad terms that in a given case there is no law to apply." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985) (quoting *Citizens to Preserve Overton Park v. Volpe, Inc.*, 401 U.S. 402, 410 (1971)). The statutory requirement that BPA operate in a manner "consistent with sound business principles" is at least as specific as other statutory mandates held sufficient to permit judicial review.

For example, *Keating v. FAA*, 610 F.2d 611 (9th Cir. 1979), held that an FAA Administrator's decision was reviewable where the relevant statute required that the decision be made "in the public['s] interest." *See id.* at 612. Similarly, *City of Los Angeles v. U.S. Dep't. of Commerce*, 307 F.3d 859 (9th Cir. 2002), determined that a statute requiring the Secretary of Commerce to use statistical sampling "if he considers it feasible" provided a meaningful standard for the court to review the Secretary's decision not to use sampling. *See id.* at 869 n.6; *see also Barber v. Widnall*, 78 F.3d 1419, 1423 (9th Cir. 1996) (holding a decision of the Secretary of the Air Force not to correct a military record reviewable where the governing statute allowed the Secretary to make a correction "when the Secretary considers it necessary to correct an error or remove an injustice"). And, of course, it is well-established that courts may review FERC's determination that a given electricity rate is "just and reasonable." *See Morgan Stanley Capital Group Inc. v. Pub. Util. Dist. No. 1 of Snohomish County*, 128 S. Ct. 2733, 2738 (2008); *see also E.& J. Gallo*

*Winery v. Encana Corp.*, 503 F.3d 1027, 1039 (9th Cir. 2007). If we may review whether a decision was "in the public's interest" or whether a particular act was "feasible" or "just and reasonable," we can certainly review whether an action is "consistent with sound business principles."

Moreover, courts routinely review the rationality of business decisions in other contexts. For example, under the common law "business judgment rule," courts are required to defer to business decisions made by a corporation's board of directors, unless "the directors[, among other things,] act in a manner that cannot be attributed to a rational business purpose." *Brehm v. Eisner*, 746 A.2d 244, 264 n.66 (Del. 2000); *see also Navellier v. Sletten*, 262 F.3d 923, 946 (9th Cir. 2001) (affirming district court's formulation of the business judgment rule as requiring a director to "[r]ationally believe that the [director's] business judgment is in the best interest of the corporation").

Even more relevantly, the Sixth Circuit, in interpreting a statutory directive very similar to the statutory requirements at issue here, concluded that there was sufficient law to apply. *See McCarthy v. Middle Tenn. Elec. Membership Corp.*, 466 F.3d 399 (6th Cir. 2006). In *McCarthy*, the Sixth Circuit held that an electric cooperative's decision to incur "non-necessary expenses," if proven true, would "clear[ly]" violate the cooperative's statutory duty under Tennessee law to provide its "members with electricity 'at the lowest cost consistent with sound business principles.' " *Id.* at 410 (citing Tenn. Code Ann. § 65-25-203).

The statute at issue in *Rank v. Nimmo*, 677 F.2d 692 (9th Cir. 1982), which was found *not* to provide law to apply, provides a useful contrast to the statutes held to permit review in the cases just surveyed. In *Rank*, the relevant statute provided that "the Administrator [of the Veterans Administration] may, at the Administrator's option," accept assignment of a veteran's loan. *See id.* at 699-700. According to the court, Con-

gress's use of "the precatory 'may' " and of the phrase "at the Administrator's option" made "clear that Congress intended to vest the widest discretion possible in the Administrator." *Id.* The Administrator's decision to accept or reject assignment of a loan was therefore unreviewable. *See id.*

**[8]** No such precatory language existed in the statutes in the cases we have reviewed, and none exists in the statutes governing BPA's conduct in this case. Section 838g, for instance, states that BPA "shall" fix and establish rates in a manner consistent with "sound business principles." 16 U.S.C. § 838g; *see also* 16 U.S.C. § 839e(a)(1) (stating that "rates *shall* be established . . . in accordance with sound business principles") (emphasis added). Moreover, unlike in *Rank*, BPA's governing statutes do not evince an intention on Congress's part to vest BPA "with the widest discretion possible," by referring to BPA's "option" or "choice" or similar language. To the contrary, by requiring BPA to act in a prescribed manner — i.e., in a manner that "accord[s] with sound business principles" — Congress clearly intended to limit BPA's discretion to a degree.

Finally, BPA is incorrect in maintaining that *City of Santa Clara* and *Alcoa* held that the "sound business principles" standard is so vague that it provides no law to apply. Those cases held instead that a congressional directive to sell power "in such a way as 'to encourage the most widespread use thereof' " was "too vague and general" to provide applicable law. *See City of Santa Clara*, 572 F.2d at 668; *Alcoa*, 903 F.2d at 599. Neither case directly precluded reviewability under the "sound business principles" standard at issue here, and neither can be fairly taken to have done so by implication — particularly in light of the already surveyed precedents to the contrary.

In *City of Santa Clara*, the petitioners argued that certain decisions made by the Secretary of the Interior violated Section 5 of the Flood Control Act of 1944. *See City of Santa*

*Clara*, 572 F.2d at 667. Section 5 requires the Secretary to "transmit and dispose of [surplus energy from reservoir projects] in such manner as to encourage the most widespread use thereof at the lowest possible rates to consumers consistent with sound business principles." 16 U.S.C. § 825s. We refused to review the decision, holding that the statute's "widespread use" requirement was too vague to support judicial review. *See City of Santa Clara*, 572 F.2d at 668. As we explained,

> The Flood Control Act's directive to market power in such a way as to "encourage the most widespread use thereof" could be interpreted in many different ways, such as to require that power be sold to as many different preference entities as possible, thereby fostering the most widespread geographic use of the power, or to mandate sale of the power to those preference entities whose customers present the most diversified mix of agricultural, industrial or residential users, or to require sale of federal power to those preference entities which serve the largest number of ultimate consumers.

> Clearly, the "most widespread use" standard is susceptible of widely divergent interpretations. As we said of another law in *Strickland v. Morton*, *supra*, "(t)he provisions of this statute breathe discretion at every pore." 519 F.2d at 469. The statute permits the exercise of the widest administrative discretion by the Secretary. It does not supply "law to apply."

*Id.* at 668.

As the above quoted passage reveals, the court in *City of Santa Clara* considered only whether the "widespread use" clause provided law to apply; it did not address the "sound business principles" clause. In this case, we are concerned

solely with the "sound business principles" standard, a standard that "permeate[s]" BPA's governing statutes. *See APAC*, 126 F.3d at 1171 (citing 16 U.S.C. §§ 825s, 838g, 839e(a)(1)); *see also* 16 U.S.C. § 839f(b) ("[T]he Administrator shall take such steps as are necessary to assure the timely implementation of this chapter in a sound and businesslike manner."). *City of Santa Clara*'s holding is therefore not applicable here.[8]

For similar reasons, this court's holding in *Alcoa* is inapplicable. In *Alcoa*, the petitioners asserted that BPA had violated section 7(k) of the Regional Act when it established certain

---

[8]Even if *City of Santa Clara*'s holding was on point, that holding may no longer be good law. *City of Santa Clara* predates both *Heckler v. Chaney*, 470 U.S. 821 (1985), and *Webster v. Doe*, 486 U.S. 592 (1988). In those cases, the Supreme Court clarified "what it means for an action to be 'committed to agency discretion by law.' " *Webster*, 486 U.S. at 599. In doing so, the Supreme Court emphasized that the "committed to agency discretion" exception to judicial review is a "very narrow exception." *See Heckler*, 470 U.S. at 830.

Consistent with the emphasis in *Heckler* and *Webster* on the extreme narrowness of the "committed to agency discretion" exception, the Supreme Court in *City of Fulton* substantively reviewed the actions of the Secretary of Energy under the part of Section 5 of the Flood Control Act at issue in *City of Santa Clara*. 475 U.S. at 667-68. Although the Court did not specifically reference the "widespread use" phrase of Section 5, it did cite the "lowest possible rates" phrase that immediately follows, and is logically linked to, the "widespread use" language. *See id.* (holding that Section 5 requires the Secretary "to protect consumers by ensuring that power is sold 'at the lowest possible rates . . . consistent with sound business principles.' "); 16 U.S.C. § 825s ("[T]he Secretary of Energy [shall dispose of surplus energy from reservoir projects] in such manner as to encourage the most widespread use thereof at the lowest possible rates to consumers consistent with sound business principles."). Unlike the court in *Santa Clara*, the Supreme Court did not conclude that Section 5's "most widespread use" and "lowest possible rates" directives rendered the entire statutory section "so imprecise that its interpretation requires a profound exercise of discretion." *See City of Santa Clara*, 572 F.2d at 668 (quotation marks and citations omitted). To the contrary, it reviewed the Secretary's decision for compliance with Section 5's statutory mandates generally.

rates for non-firm power. *See Alcoa*, 903 F.2d at 599. Section 7(k) requires BPA to establish nonfirm energy rates in accordance with a number of statutory provisions, including § 838g. *See* 16 U.S.C. § 839e(k). Reviewing the various statutory provisions, the court in *Alcoa* concluded that section 7(k) "require[s] that BPA rates for nonfirm energy be drawn:

> 1. having regard to the recovery of the cost of generation and transmission of such electric energy;
>
> 2. so as to encourage the most widespread use of Bonneville power;
>
> 3. to provide the lowest possible rates to consumers consistent with sound business principles; and
>
> 4. in a manner that protects the interests of the United States in amortizing its investments in the projects within a reasonable period."

*Alcoa,* 903 F.2d at 590-91.

The court then addressed the question "whether there is law to apply here to the four standards section 7(k) incorporates." *Id.* at 599. Citing *City of Santa Clara*, the court noted that "the 'widespread use' requirement provides BPA with . . . so much discretion that there is no law to apply." *Id.* The court nonetheless held that there was law to apply overall because the first and fourth standards "limit[ed] BPA's discretion" to set nonfirm energy rates. *Id.* It was careful to note that "[t]his conclusion does not conflict with *City of Santa Clara*, because these two standards were not present in that case." *Id.* Although the court in *Alcoa* did not apply the "consistent with sound business principles" standard, it did not state that the standard provided no law to apply. Nor was there any need for

the case to address that standard, as the court held that other standards set forth in section 7(k) provided adequate law.[9]

[9] In sum, neither *City of Santa Clara* nor *Alcoa* addressed the reviewability of the standard at issue here. As a result, neither decision controls the outcome of this case.

[10] For all the reasons noted above, we hold that the "sound business principles" standard incorporated in BPA's governing statutes is sufficiently specific to support judicial review and does not indicate that Congress "committed to agency discretion" decisions concerning compliance with that statutory requirement.

### C.   BPA's decision to enter into the amended contract does not  conform with "sound business principles."

Having determined that the "consistent with sound business principles" standard provides adequate law to apply, we next turn to the question whether, as the agency maintains, its decision to enter into the amended contract conforms with that statutory mandate. In resolving this issue, we are "particularly deferential" to "the agency's assessment of whether its actions 'further BPA's business interests consistent with its public mission.' " *PNGC*, 550 F.3d at 861 (quoting *APAC*, 126 F.3d at 1171). We may only set aside such an assessment if it is unreasonable, meaning that it is "contrary to clear congressional intent or that [it] frustrate[s] the policy Congress sought

---

[9]Noting that *Alcoa* stated in passing that "this 'widespread use' standard [ ] incorporates two of the four standards BPA must use," *Alcoa*, 903 F.2d at 599, BPA posits that we must have been including the "sound business principles" standard as one of the two standards, and so must also have meant to include that provision in the earlier statement that "the 'widespread use' requirement provides BPA with . . . so much discretion that there is no law to apply." *Id.* This chain of inferences is simply too thin to constitute a holding, particularly about an issue, the impact of the "sound business principles" standard, that was not necessary to the court's conclusion that the relevant agency action was reviewable.

to implement." *See Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1175 (9th Cir. 2002); *see also Kaiser Aluminum & Chem. Corp. v. BPA*, 261 F.3d 843, 848-49 (9th Cir. 2001) (noting that this court does not defer to BPA's construction of its governing statutes where BPA's interpretation is "inconsistent with statutory mandates, or [contravenes] the statutory policy Congress intended to implement.").

Although we do not reject BPA's views of its statutory authority lightly, we are compelled to do so here. Congress intended BPA to conduct its affairs in a "sound and business-like manner." *See* 16 U.S.C. § 839f(b). That mandate requires BPA to operate in "a manner consistent with sound business principles." *See supra* Section III.A; *see also* 16 U.S.C. § 838g; *PNGC*, 550 F.3d at 875. For the reasons discussed below, the agency's decision to pay Alcoa up to $32 million cannot be squared with this clear congressional directive. As a result, we hold that the agency's conclusion that it had the statutory authority to enter into the Alcoa amendment was not reasonable. *See Biodiversity Legal Found.*, 390 F.3d at 1175 (holding that an agency's interpretation of its governing statutes is unreasonable if it is "contrary to clear congressional intent or . . . frustrate[s] the policy Congress sought to implement").

**[11]** Like its decision to enter into the initial contract, BPA's agreement to the Alcoa contract amendment is, on its face, a "highly suspect" one. *See PNGC*, 550 F.3d at 875. The amended contract requires BPA to pay Alcoa up to almost $32 million over a nine month period. BPA is to receive nothing in return. In essence, then, BPA has agreed to provide a non-obligatory gift of up to $32 million. The agency concedes, as it did in *PNGC*, that its decision to provide this voluntary gift will lead to higher rates for its other customers. *See id.* Given that BPA was under no obligation to contract with Alcoa, let alone to pay it over $30 million in cash, and that the amended contract will inevitably lead to higher prices for all other customers, BPA's decision raises serious questions

concerning compliance with its statutory obligation to maintain "the lowest possible rates to consumers consistent with sound business principles." 16 U.S.C. § 838g; *see PNGC*, 550 F.3d at 875; *see also McCarthy*, 466 F.3d at 410 ("If the Cooperatives failed to maintain records and spent their money on non-necessary expenses, it is clear that they were not acting in accordance with their statutory purpose of providing their members with electricity 'at the lowest cost consistent with sound business principles.' ").[10]

[12] Moreover, the amended contract requires Alcoa to use the $32 million to purchase power from BPA's competitors (because BPA itself is not selling physical power to Alcoa). In other words, BPA has effectively agreed to subsidize the operations of its competitors, competitors who, in the past, have not hesitated to take business away from BPA. In *Kaiser Aluminum*, for instance, the court noted that, as the wholesale price for power in the Northwest began to drop in the mid-1990s, competition for the DSIs' business increased substantially, and "[m]any DSIs were considering offers from alternative power suppliers at prices below BPA's rates." 261 F.3d at 846. In response, BPA was forced to amend its long-term contracts with the DSIs by adjusting rates downward. *See id.*

---

[10]We agree with BPA that if the agency's decision to incur the $32 million expense at issue here was valid, it could lawfully include that cost in the rates it charges its preference customers. *See Golden Nw. Aluminum, Inc. v. BPA*, 501 F.3d 1037, 1045 (9th Cir. 2007) (holding that "nothing in [the relevant section of the Northwest Power Act] precluded BPA from considering the costs of [resources needed to service valid contracts with the DSIs] when calculating its preference rate, even though BPA would not have incurred such costs absent its DSI contracts"). In *Golden Northwest*, however, unlike in this case, petitioners had not filed a timely challenge to the validity of the DSI contracts that generated the costs at issue. *See id.* at 1044-45. As a result, the court was required "to take[ ] the existence of BPA's contractual obligations to its DSI customers as given." *Id.* at 1045.

In this case, petitioners have filed a timely challenge to the underlying contract. Thus, we are required to address the preliminary issue that the court in *Golden Northwest* took as given.

**[13]** At the present time, wholesale market rates are sub-stantially higher than both the PF rate and the IP rate. BPA's competitors are therefore at a price disadvantage and cannot put direct pressure on BPA to lower its prices. BPA's deci-sion, during a time of relative competitive advantage, to trans-fer $32 million to these competitors would not appear to make sound business sense.[11]

BPA nonetheless argues that the decision to execute the amendment "advances [its] business interest in numerous respects." First, the agency maintains that the amendment was necessary to avoid "any unnecessary interruption of smelter operations, especially given the difficult economic times and potential loss of additional jobs." This justification is essen-tially identical to one we rejected as invalid, while sympathiz-ing with its humanitarian goals, in *PNGC.* 550 F.3d at 877-78. In *PNGC*, BPA had attempted to justify the monetization pro-vision of the 2007 Contract, in part, on the ground that the "monetary benefits" were necessary to ensure the continued operation of the aluminum smelters and to protect "DSI jobs." *Id.* We held that this goal, while "laudable," was "simply not reflective of a 'business-oriented philosophy.' " *Id.* at 878. We also noted that BPA's counsel had conceded at oral argu-ment that "[i]t's not Bonneville's responsibility to ensure that [the DSIs] exist." *Id.* at 877 n.36 (alterations in original); *see also Envtl. Def. Ctr., Inc. v. EPA*, 344 F.3d 832, 858 n.36 (9th Cir. 2003) (noting that an agency action should be set aside where, among other things, the agency "has relied on factors which Congress has not intended it to consider") (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut.*

---

[11]Petitioners also maintain that BPA's decision to enter into the amended contract was not consistent with sound business principles because the agency did not first seek a refund of funds it improperly paid to Alcoa pursuant to the 2007 Contract. As BPA notes, however, there is a significant possibility that the DSIs do not owe BPA a refund. *See infra* Part IV. Given this possibility, the agency's failure to seek a refund before entering into the amended contract does not, standing alone, render the decision unreasonable.

*Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). For these same reasons, BPA's first justification does not demonstrate that the agency's decision to enter into the amended contract was a reasonable business decision.

Second, BPA asserts that the monetary benefit payments were necessary to assure the continued existence of the DSI load, and that that was important because "[t]he DSI load has provided enormous value to BPA in the past and it is reasonable to believe that it will do so again." As evidence of the past value that DSIs have provided, BPA cites the fact that the DSIs purchased "relatively flat blocks" of power, accepted power at "light load hours," and provided BPA with additional power reserves.

There are several problems with this rationale. First, it comes fairly close to another justification that the panel rejected in *PNGC*: BPA's "historic relationship with the DSIs [and] the important role the DSIs played in the development of the [federal power systems]." *PNGC*, 550 F.3d at 877 (second alteration in original).

Second, the primary examples of the DSIs' value to the agency that BPA cites result from the sale of *physical* power to the DSIs. Because BPA will not provide Alcoa with physical power under the amended contract, BPA will not receive those benefits from Alcoa, at least in the short term. *See Envtl. Def. Ctr., Inc.*, 344 F.3d at 858 n.36 (stating that an agency's determination is not entitled to deference where the agency's explanation for its conclusion is "implausible").

BPA asserts that its decision to monetize the contract amendment was a sound business one because "monetization [has] certain obvious risk management benefits." These risk management benefits include eliminating both "the risks [to BPA] associated with making the relatively large wholesale market power purchases [at fluctuating prices] BPA would be required to undertake . . . to serve Alcoa's current operating

load" and the risk that Alcoa would be unable to pay for physical power that BPA delivered.

**[14]** Although we do not doubt that monetization provides these benefits, BPA's decision to monetize cannot, on its own, justify the Alcoa contract amendment, for three reasons. First, monetizing a contract only makes sound business sense if the underlying contract is a sound one. For the reasons we discuss above, BPA could not reasonably have concluded that its decision to sell power to Alcoa, and thereby incur a $32 million loss, was "consistent with sound business principles." If anything, the agency's decision to monetize highlights the fact that the contract amendment amounts to no more than a $32 million gift to Alcoa.

Second, BPA attempted to justify the contract amendment by citing to benefits that had previously accrued to the agency when it sold physical power to Alcoa and the other DSIs. By monetizing the contract, BPA undermined this justification.

Third, the very reasons BPA provided for its decision to monetize the contract — reducing the significant risk of non-payment by Alcoa and eliminating the market risks that BPA would face if it sold physical power to Alcoa — underscore the unreasonableness of BPA's belief that Alcoa will provide future benefits to the agency that will offset the current $32 million cash payment. The agency does not explain why, given that the risks of selling power to Alcoa are currently so significant that the agency would rather give the company money to purchase power from a competitor than deliver power to the aluminum company itself, it reasonably believes that the risks will be less significant in the future or that Alcoa's financial situation will improve.

**[15]** The fourth, and perhaps most important, problem with BPA's contention that Alcoa will provide future benefits to the agency that will offset the $32 million that BPA voluntarily agreed to pay the aluminum company is that the agency's

assertion is without any analytic or evidentiary support. For example, BPA has not quantified the monetary value of the past benefits that the DSIs provided. Nor has the agency analyzed how likely it is that Alcoa (either directly or indirectly through its employees) will be able to provide benefits in the future, when the aluminum company will provide these proposed benefits, and how much those benefits will be worth. Perhaps voluntarily paying $32 million to help ensure Alcoa's viability at the expense of other customers will lead to higher revenues or lower costs for BPA in the future. BPA, however, has not demonstrated that it has any basis for believing that it will. In short, neither the record in this case nor the record in *PNGC* contains any financial or other business analysis or evidence to support the agency's assertion that future benefits to the agency are (a) likely or (b) sufficiently large to make the decision to give $32 million away a sound business decision. *See Envtl. Def. Ctr., Inc.*, 344 F.3d at 858 n.36 (no deference is due an agency's conclusion where the agency "entirely failed to consider an important aspect of the problem").

Moreover, the information that the administrative record does contain would lead a rational observer to conclude that Alcoa is not particularly likely to provide significant future benefits to the agency. All of the parties agree that the total DSI load has been steadily declining for many years and now accounts for a relatively small percentage of BPA's power sales. Admin. Record at 76 ("[T]he aggregate DSI load has decreased substantially over the past decade due to adverse global aluminum market forces . . . ."). According to figures available on BPA's website, DSI load accounted for 630 aMW, or less than 3%, of BPA's firm power load in 2008, down from 3150 aMW in the early 1990s. *See also APAC*, 126 F.3d at 1164.[12] BPA also asserted, in its letter to constitu-

---

[12]*See* Bonneville Power Administration, 2007 Pacific Northwest Loads & Resource Study 37 (2007), *available at*: http://www.bpa.gov/power/pgp/whitebook/2007/Summary_Document_2007_White_Book.pdf

ents, that Alcoa's aluminum smelter might close down for good if the agency failed to make even a single monthly monetary benefit payment. But the agency further noted, in the preamble to the contract amendment itself, that there was "uncertainty that Alcoa will continue operating at existing levels" during the nine-month amendment period even with the benefit of the agency's monetary payment. Given that the only information in the record shows that DSI load has been steadily declining for years and that the current health of the aluminum smelting industry is precarious at best, BPA could not reasonably have concluded that Alcoa will be healthy enough in the future to provide sufficient benefits to BPA to compensate for the tens of millions of dollars that the agency is now giving away. *See Envtl. Def. Ctr., Inc.*, 344 F.3d at 858 n.36 (noting that an agency's decision is not entitled to deference where the agency "offer[s] an explanation for its decision that runs counter to the evidence before the agency"). It may be that DSI demand has fluctuated significantly in the past and that the recovery of the aluminum industry can be reasonably anticipated. But nothing in the record of this case or the earlier one, aside from BPA's conclusory assertions, suggests as much.

In sum, had BPA at any point performed a reasonable business analysis of its decision to offer one of its customers a $32 million cash payment which the customer was required to spend on services provided by one of BPA's competitors, we may well have deferred to its business judgment. But the agency has not done so, and so has failed to demonstrate that it had any basis for concluding that its decision to incur a non-obligatory expense of almost $32 million was a sound business judgment.

As a final justification for the amendment, BPA asserts that "[t]he Alcoa Amendment is nothing more than a temporary solution while BPA and the region engage in a further administrative process to more fully respond to *PNGC*." According to the agency, the short-term nature of the amendment, com-

bined with the agency's need to act quickly, renders its decision to enter into the amendment a sound business judgment.

This rationale is the most plausible of those BPA offers. But even assuming that exigent circumstances could render reasonable BPA's decision to spend millions of dollars it was not obligated to spend, BPA has not established in the record — even barely — that such exigent circumstances exist. BPA explained in its January 13th letter announcing the execution of the amended contract that "it was necessary to move quickly to implement the amendment and avoid, if possible, any unnecessary interruption of smelter operations." But nothing in the administrative record demonstrates that smelter operations would have been threatened absent immediate action on BPA's part. In fact, the available information again suggests otherwise. In its January 13th letter, BPA noted that CFAC had announced a likely plant closure and that this announcement "reinforced [the agency's] view that it was important to act quickly." Yet, the agency did not execute an amended contract with CFAC until March, two months after it agreed to the amended contract with Alcoa and almost three months after we issued our opinion in *PNGC*. This two-to-three month delay indicates that BPA had time to consider more thoroughly than it did whether its decision to spend tens of millions of dollars was in its business interests.

Moreover, BPA failed to demonstrate why the payment of almost $32 million over nine months, as opposed to the payment of a lesser amount, was necessary to avoid the interruption of Alcoa's smelter operations. A prudent business would presumably want to minimize its discretionary expenses, even in an emergency. Yet, the administrative record contains no evidence that BPA considered precisely how large (or small) a payment was necessary to buy the company the time it needed so that the agency could fully consider further action.

Because the record contains no information from which BPA could have concluded that it needed to act as quickly as

it did or that it needed to pay Alcoa as much as $32 million to avert an emergency, we hold that BPA cannot reasonably justify its decision to enter into the amended contract on the ground that exigent circumstances required immediate action.

**[16]** For all of the above reasons, we hold that BPA has failed to demonstrate that it reasonably believed its decision to execute the Alcoa contract amendment was consistent with "sound business principles." To be clear, we do not hold that BPA's governing statutes prohibit the agency from selling power to the DSIs at the IP rate or that the agency may not "monetize" such a sale under any circumstances. If the agency provides a rational business justification for a sale (monetized or otherwise) that is supported by the record before the agency, we would be obliged to defer to the agency's expertise. In this case, however, the agency has entered into a transaction that, on its face, is not "eminently businesslike." *See Bell*, 340 F.3d at 949. Moreover, the agency's justifications for its agreement to the transaction fall far short of establishing that its decision to award substantial, non-necessary "benefits" not involving the sale of power was a sound business one. We therefore conclude that the agency has acted in a manner that is not in accordance with its statutory obligations.

Although we cannot defer to BPA's voluntary decision to provide Alcoa with up to $32 million in cash payments, we note that the decision to sell physical power to Alcoa might produce a different result, for several reasons. First, the sale of physical power to the DSIs is expressly authorized by statute, *see* § 839c(d)(1)(A), while the payment of cash is not. Given that Congress intended the agency to sell physical power to the DSIs, BPA's conclusion that such a sale is in its business interests is more likely to be reasonable. Second, as noted above, many of the justifications that BPA gave for its decision to execute the costly amended contract, though inapplicable to a "monetized" sale, would apply to a physical power sale. *See supra* p. 3301. Third, a physical power sale implicates a number of issues that fall within BPA's particular

expertise. Such issues include BPA's current and future generating capacity, its transmission capabilities, its relationship with suppliers, its current and projected commitments of physical power to other customers, its ability to acquire additional power if needed, and so forth. Simply giving away $32 million in cash to a customer does not, by contrast, involve issues that the agency is uniquely positioned to address. In short, although we do not defer to BPA's determination that paying Alcoa $32 million was "consistent with sound business principles," the agency's conclusion that a physical sale of power to Alcoa, even at loss, furthered its business interests might very well warrant our deference.

## IV.   Conclusion

We hold that BPA has once again failed to advance "a 'reasonable interpretation[ ] of its governing statutes' that supports its actions." *PNGC*, 550 F.3d at 878 (alteration in original). More specifically, the agency has failed to show that its decision voluntarily to incur a $32 million expense that will increase the rates of its preference customers, provides no direct benefit to the agency, and subsidizes the operations of its competitors was a reasonable interpretation of its statutory obligation "to operate with a business-oriented philosophy." *APAC*, 126 F.3d at 1171. Consequently — and with due regard to our obligation to defer to BPA's conclusion regarding whether its action comports with the "sound business principles" standard if it is at all reasonable to do so — we hold that the amended Alcoa contract provision is invalid.[13]

In addition to seeking a declaration that the Alcoa contract amendment is unlawful and invalid, Petitioners ask us to issue

---

[13]Because we conclude that the monetary benefit provision is invalid for the reasons raised by the petitioners, we do not decide whether Alcoa's alternative argument that the monetary benefit payments were impermissibly low was properly before us, or, if it was, whether that argument is meritorious.

an order "compel[ling] BPA to seek a recovery from Alcoa of unlawful payments so that they can be refunded or credited to the customers of BPA who bore those costs in their rates." We decline to do so. Instead, we remand this case to BPA to determine whether and how it will seek a refund from Alcoa. *See Pub. Util. Dist. No. 1 of Snohomish County v. BPA*, 506 F.3d 1145, 1147-48, 1154 (9th Cir. 2007) (remanding case to BIA for the agency to determine in the first instance how to respond to the court's invalidation of multiple settlement agreements that the agency had entered into improperly).

Among other reasons why a remand is appropriate, BPA has yet to consider the validity and applicability of a damages waiver provision that appears in the 2007 Contract and was incorporated by reference into the amended contract. *See PNGC*, 550 F.3d at 881-82 (holding monetization provision of the 2007 Contract invalid, but remanding case "to BPA to determine in the first instance the applicability and construction of . . . the damage waiver" provision of the contract). The agency will also need to consider Alcoa's argument that no refund is due because the aluminum company, at the agency's demand, purchased wholesale power at rates well above what it could afford.

Moreover, the agency has informed the court that it has already begun a public process to consider the damage waiver and refund issue with respect to the 2007 Contract. Once that process is complete and BPA has both reached a final conclusion on the refund issue and generated an appropriate administrative record, the issue will be ripe for this court's review. *See id.*

One final note: We have approached this case with careful regard for the limited judicial role in overseeing BPA's execution of its obligations and authority. The agency's role is an essential one in providing power to the Northwest, and it is subjected to competing demands from various constituencies in the region. Reviewing the underlying agency proceedings

in this case and in *PNGC*, it becomes apparent that BPA's peculiarly dual role, as both a federal agency and a power business, can create situations in which it can fulfill neither role very well and so has reasons to test the limits of its statutory authority. Whether the statutory scheme bears revisiting so as to make BPA's job easier — for example, by providing it with the obligation or authority to provide power to the historic DSIs even when it is not a sound business decision to do so — is not, however, a question judges can answer. Instead, we must determine whether BPA's actions, however well motivated, are so clearly outside its statutory authority that even taking into account the very large measure of deference due its decisions, we have no choice but to disapprove its action. That is the case here.

**[17]** In sum, we GRANT Pacific Northwest Generating Cooperative's, Public Power Council's, and Industrial Customers of Northwest Utilities' petitions as to their challenge to the validity of the Alcoa contract amendment and REMAND to the agency for determination of the applicability of the agreement's damage waiver provision.

PETITIONS GRANTED IN PART, DENIED IN PART, AND DISMISSED IN PART.