BEA, Circuit Judge,
concurring in part and dissenting in part:
I agree with the panel’s judgment denying the petitions as to the First Period of the contract between the Bonneville Power Authority (“BPA”) and the Aluminum Company of America (“Alcoa”), as extended by the parties. I dissent, however, from the panel’s judgment dismissing the petitions seeking to invalidate the contract’s Second Period because I find Petitioners have standing to press their claims, and that their claims are valid, as far as they are based on BPA’s statutory duty to charge Alcoa the IP rate. See Maj. Op. Part IV. We should grant the petition as to the Second Period of BPA’s contract with Alcoa.
The effect of the BPA-Alcoa contract is that BPA will lose up to $66,000,000 annually for five years ($5,500,000 a month) as the difference between BPA’s costs of production and transmission and the price paid by Alcoa. These losses must be made up by rate hikes to BPA’s other customers, such as Petitioners. Such losses cannot be justified by the agency’s interpretations of what constitutes “sound business practices,” nor by the so-called Equivalent Benefits standard, because BPA is constrained by statute to sell power to Alcoa at the IP price, and at no other price. Properly tabulated, the IP price must prevent the losses projected by BPA or, indeed, any loss at all. Micro-economic social engineering to preserve jobs at Alcoa is not within the agency’s “discretion,” which is just another way of saying “power.”
BPA’s preference customers, as well as other entities and organizations in the Pacific Northwest, filed this petition for review, requesting that we hold the unlawful Second Period of BPA’s contract with Alcoa is inconsistent with the agency’s statutory mandate to act in accordance with sound business principles. They claim BPA should have maximized profits by selling power to Alcoa at market rate. Alcoa also petitions for review, arguing that BPA erred in adopting the Equivalent Benefits standard[1] because it is contrary to BPA’s governing statutes, and that if BPA had not made this error, it would have entered into a contract even more favorable to Alcoa’s interests. In short, each party contends BPA has a duty to charge its other customers more, so that it may charge the complaining party less. Each is mistaken. BPA in turn contends it should not be bound by the Equivalent Benefits standard and should have even wider latitude to determine rates. While BPA is correct that the Equivalent Benefits test, which it invented, is not binding, BPA is still bound by the Congressional statutes which govern it in determining rates — -statutes it continually overlooks. Those statutes convey far less latitude in determining rates than BPA thinks.
The parties concentrate almost exclusively on the content and applicability of the Equivalent Benefits standard as a con *798 sideration in pricing. They ignore the plain language of the relevant statutes which mandate that BPA is authorized to sell power to Direct Service Industrial (“DSI”) customers such as Alcoa at the Industrial Firm Power rate (the “IP rate”) — not more as Petitioners contend, and not less as BPA and Alcoa contend. See 16 U.S.C. §§ 838g, 839a(10), 839c(b), 839e(b)(l). Because the Second Period of BPA’s contract with Alcoa fails even to recover BPA’s costs, let alone charge Alcoa the IP rate, it violates BPA’s governing statutes.
The majority thinks it best not to address the parties’ attempt to draft a Second Period of the contract now. It would rather wait until the parties draft a new contract and then review those terms. It concentrates entirely on the recent letters by the parties making it clear they will not draft a new contract until after a ruling from this court. Maj. Op. at 793-94. The majority’s view has a definite appeal to it, and if this were an ordinary contract affecting only the contracting parties, I might agree. But this is not an ordinary contract. To the contrary, the terms of the new contract will affect the rates BPA charges millions of other customers. And the majority’s opinion does not give the parties the guidance they have shown they need. Most importantly, the history of contracts between BPA and Alcoa shows that these parties have repeatedly entered into contracts designed to subsidize Alcoa, and will continue to do so in the future. In these letters relied on by the majority, neither BPA nor Alcoa agree to set out their options for the terms of the contract they might draft in the future — including any provisions for payment of damages caused to the Petitioners should the contract be found to be invalid under the governing statutes. It is foolish for us to ignore what these parties have actually done in the past. We should give these filings little weight given the consistent conduct of the parties in the past, and the heavy price paid by the public each time. I fear it is the majority that is ignoring the relevant evidence in the record of the parties’ past conduct.
This is the third time we have reviewed a contract between BPA and Alcoa in which BPA essentially subsidizes Alcoa’s purchase of power in the amount of roughly $60,000,000 a year. It is predictable that BPA and Alcoa will enter into yet another contract which will result in Alcoa purchasing power at less than the IP price, and it is predictable that yet again the wheels of the judicial review system will grind too slowly to avoid the resultant and unrecoverable rate hikes to preference customers which BPA must put in place to balance its books. Thus, like our review of the First Period, this is a problem capable of repetition, yet escaping judicial review. We should hold that this new form of subsidy is equally invalid.
Because BPA continues to sell power to Alcoa and will in all probability continue to do so in the future, and because the terms of the Second Period could result in a loss of up to $5,500,000 per month, it is prudent to set forth a few principles the parties must keep in mind when re-negotiating their contract.
First, BPA is prohibited by statute from selling power to any of its customers below its properly tabulated costs of production and transmission. The PF rate for preference customers must cover that cost. The IP rate for direct service industrial customers must similarly cover the costs of production and transmission, plus the normal retail markup the industry-owned utilities in turn charge their customers. BPA can sell power to Alcoa only at the IP rate.
Second, the parties misinterpret the phrase “sound business principles” in the *799 statute. This phrase usually applies to proper cost accounting principles for long-term assets; it does not justify BPA subsidizing Alcoa by charging it a rate lower than the IP rate, let alone a rate lower than BPA’s costs. It calls for BPA to use sound judgment in the allocation of costs; it does not give BPA permission to engage in regional economic planning.
Third, the present BPA-Alcoa contract ignores this statutory mandate and anticipates that BPA will lose up to $330,000,000 in its performance of the contract during the Second Period. The BPA-Alcoa contract provides that BPA will recover this loss by raising the rates it charges its other customers by up to four percent (4%); thus Petitioners will be directly affected financially by the contract if BPA and Alcoa continue as stated in their contract. And the contract provides that Petitioners cannot simply sue afterwards to recover this money.
Fourth, if Petitioners are forced to wait until the Second Period has begun to challenge the BPA-Alcoa contract, it will be in large measure too late to prevent their quite foreseeable overcharges. BPA will lose approximately $5,500,000 a month until a final judicial ruling. BPA must make up that loss by raising rates on its other customers, including Petitioners, because it is prohibited by statute from seeking funds from the federal government to make up its loss and there is no other purse to tap. And, according to the contract, if the BPA-Alcoa contract is found to be invalid, BPA cannot seek damages from Alcoa. Once the operating losses are sustained, BPA will have no other avenue than to raise the rates its charges its other customers to make up the loss.
Thus, I dissent from the court’s judgment as to the Second Period because the terms of the Second Period of the BPA-Alcoa contract violate BPA’s statutory duty to recover its costs before BPA loses millions of dollars recoverable only by imposing a surcharge on its other customers such as Petitioners; and I dissent from that portion of the court’s judgment that Petitioners do not have standing to have this determination made.
I
BPA is prohibited by statute from selling power to Alcoa at a loss.
When reviewing a challenge to an agency’s statutory authority, we must “begin ... by examining the statutory language.” Pac. Nw. Generating Coop. v. Dep’t of Energy (“PNGC I”), 580 F.3d 792, 806 (9th Cir.2009). If Congress clearly expressed its intent, we “reject administrative constructions of a statute that are inconsistent with the statutory mandate or that frustrate the policy Congress sought to implement.” Id. (citations omitted).
When a court reviews an agency’s construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency’s answer is based on a permissible construction of the statute.
*800 Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (footnotes omitted). Here, Congress directly spoke to the issue of what rates BPA must charge DSIs — the IP rate. Let us review the overall rate structure created by Congress.
BPA’s statutory framework sets out the specific criteria by which BPA determines the rates it may charge for power to each of the three different categories of customers it serves.
First, BPA must sell power to its “preference” customers and the investor-owned utilities (“IOUs”), 16 U.S.C. § 839c(b), at a cost-based rate referred to as the Preference Customer’s rate or “PF rate.” 16 U.S.C. § 839c(a); 16 U.S.C. § 839e. Those rates “shall recover the costs of that portion of the Federal base system resources needed to supply [preference and IOU customers’] loads until such sales exceed the Federal base system resources.” 16 U.S.C. § 839a(10) (emphasis added).[2] The power generated by BPA itself goes into the Federal base system. The recovery of BPA’s costs is not discretionary. Rates must, at a minimum, recover BPA’s costs. The Northwest Power Act:
directs BPA to “establish, and periodically review and revise, rates for the sale and disposition of electric energy,” § 839e(a)(l), which are subject to “confirmation and approval” by the Federal Energy Regulatory Commission [ (“FERC”) ] upon a finding by the Commission that, among other things, “such rates ... are based upon [BPA]’s total system costs.” § 839e(a)(2)(B). Rates for preference customers are mandated, accordingly, to be sufficient to “recover the costs of that portion of the Federal base system resources needed to supply such loads,” § 839e(b)(l), with “Federal base system resources”....
PNGC I, 580 F.3d at 801 (italics added). Thereafter, such rate or rates “shall recover the cost of additional electric power as needed to supply such loads____” § 839e(b)(l) (emphasis added). In a nutshell, if the Federal base system resources do not supply sufficient power, and BPA must buy the power in the market, BPA must charge the market rate to its customer.
Second, BPA must charge its DSI customers the IP rate which is prescribed by 16 U.S.C. § 839e(c). The IP rate must be “equitable in relation to the retail rates” charged by BPA’s preference customers to their own industrial consumers in the region, so long as the price charged by the preference customers is “based upon the Administrator’s applicable wholesale rates to [preference and IOU] customers and the typical margins included by such [preference and IOU] customers in their retail industrial rates.” 16 U.S.C. § 839e(c)(l)(B), (c)(2). Note that this provision does not provide an exception to allow BPA to lower prices below the IP rate, even if to do so would accord with sound business principles.
Title 16, Section 838g also prescribes general factors BPA must balance when setting rates for the sale and transmission of federal power:
*801 Such rate schedules ... shall be fixed and established (1) with a view to encouraging the widest possible diversified use of electric power at the lowest possible rates to consumers consistent with sound business principles, (2) having regard to the recovery (upon the basis of the application of such rate schedules to the capacity of the electric facilities of the projects) of the cost of producing and transmitting such electric power....
Section 839e similarly states that BPA’s rates:
shall ... recover, in accordance with sound business principles, the costs associated with the acquisition, conservation, and transmission of electric power, including the amortization of the Federal investment in the Federal Columbia River Power System ... and the other costs and expenses incurred by the Administrator pursuant to this chapter and other provisions of law.
16 U.S.C. § 839e(a)(l). Thus, when setting rates for any of its customers — whether preference, IOU or DSI — BPA must charge a rate that, at a minimum, recoups BPA’s own costs of generating or acquiring the electricity. Accordingly, the phrase “sound business principles” would apply to issues such as how to factor depreciation. As explained by our previous decision in PNGC I, however, the phrase does not mean BPA can decide that lowering rates for one category of customers justifies raising rates for another category. PNGC I, 580 F.3d at 821-22.
BPA argues that as a supplier of energy, it is a sound business principle for it to subsidize such large customers as Alcoa, at least for a period of time, rather than see such a customer close its doors with the resulting effect that would have on the local economy. We have previously rejected such arguments:
By subsidizing the DSIs’ smelter operations beyond what it is obligated to do, BPA is simply giving away money.... The agency cites its “historic relationship with the DSIs, the important role the DSIs played in the development of the [federal power systems], and the importance to local economies of DSI jobs” as reasons for the payments. These justifications for simply giving a few of its customers nearly $300 million, however laudable, are simply not reflective of a “business-oriented philosophy,” nor do they “further [BPA’s] business interests.” Id.
As we made clear recently in another context, BPA’s governing statutes restrain BPA’s activities even when, on a pure policy basis, those policies have much to recommend them.
PNGC I, 580 F.3d at 822-23. This is one such instance. BPA is directed to operate with “sound business principles” but the minimum its must charge the DSIs is the IP rate. 16 U.S.C. § 839e(c)(l)(B), (c)(2).
If BPA were to sell electricity to Alcoa at the statutorily-mandated IP rate, it would not lose any money, let alone $330,000,000. Remember, the IP rate is the PF rate (which recovers costs) plus the profit margin IOUs are charging their own customers. It means that DSIs have no advantage over the other businesses that buy their electricity from the IOUs instead of directly from BPA.
II
The phrase “sound business principles” in the statutes does not justify BPA charging DSIs a rate that fails to recover BPA’s costs.
By entering into this Second Period of the contract, BPA evinces a renewed misunderstanding of the impact of our opinions interpreting the phrase “sound busi *802 ness principles” as that phrase is used in BPA’s governing statutes.
The phrase “sound business principles” appears in a number of different statutes governing BPA’s actions. Where the phrase is used in connection with setting rates, it appears to be a limitation on BPA’s ability to charge low rates, not a factor that would justify charging rates that do not recover BPA’s costs and are thus even below the PF rate.
There are four relevant statutory references to the “sound business principles” in relation to the operation of BPA. 16 U.S.C. § 825s provides that “the Secretary of Energy ... shall transmit and dispose of [Army-supervised reservoir projects’] power and energy in such manner as to encourage the most widespread use thereof at the lowest possible rates to consumers consistent with sound business principles ” (emphasis added). Notice that BPA is not instructed to charge is customers “the lowest possible rates.” Rather, it is instructed to charge “the lowest possible rates consistent with sound business principles.”
Section 838g prescribes the factors BPA must balance when setting rates for the sale and transmission of federal power:
Such rate schedules ... shall be fixed and established (1) with a view to encouraging the widest possible diversified use of electric power at the lowest possible rates to consumers consistent with sound business principles, (2) having regard to the recovery (upon the basis of the application of such rate schedules to the capacity of the electric facilities of the projects) of the cost of producing and transmitting such electric power ... and (3) at levels to produce such additional revenues as may be required, in the aggregate with all other revenues of the Administrator, to pay [all expenses associated with] bonds issued and outstanding pursuant to this chapter, and amounts required to establish and maintain reserve and other funds and accounts established in connection therewith.
(emphasis added). Note that although operating with “sound business principles” is listed here in the rate making section, BPA must have “regard” for the recovery its costs of production, transmission, and debt service are listed as an independent requirements.
The phrase “sound business principles” is also used in connection with BPA’s calculation of the recovery of costs. Section 839e sets guidelines for fixing “rates for the sale and disposition of electric energy and capacity and for the transmission of non-Federal power [in other words, power that is not from the Federal Base System].” Specifically, those rates:
shall ... recover, in accordance with sound business principles, the costs associated with the acquisition, conservation, and transmission of electric power, including the amortization of the Federal investment in the Federal Columbia River Power System ... and the other costs and expenses incurred by the Administrator pursuant to this chapter and other provisions of law.
§ 839e(a)(l) (emphasis added).
Finally, the BPA Administrator is charged with “assuring] the timely implementation of [16 U.S.C. §§ 839-839h] in a sound and businesslike manner.” § 839f(b) (emphasis added).
A handful of the court’s prior cases have given some meaning to the phrase “sound business principles,” although no panel has given the phrase a comprehensive definition. Most relevant are PNGC I and Pac. Nw. Generating Coop. v. BPA, 580 F.3d 828 (9th Cir.2009), amended on denial of rehr’g by 596 F.3d 1065 (9th Cir.2010) *803 (“PNGC II ”). In PNGC I, BPA executed a contract with the aluminum DSIs such as Alcoa and the local utilities. As with all these contracts, the terms were complicated but, in essence, BPA agreed to pay-each of the aluminum DSIs a monetary payment equal to the amount of physical power the DSI purchased from the local utility partner multiplied by the difference between BPA’s PF rate and the market rate. See 580 F.3d at 798-800. This agreement was to last five years, but BPA retained the right simply to supply the DSIs with power directly at the PF rate during the last two years. Id. Thus, the DSIs could buy as much or as little power as they wanted from any electricity supplier at the PF rate, instead of having to pay the higher IP rate or market rate. BPA acknowledged that “service to the DSIs will come at the expense of higher rates paid by ... preference customers.” Id. at 801.[3]
This court held that monetary payments by BPA to Alcoa and other DSIs was “highly suspect” because, inter alia, BPA was giving Alcoa such a large subsidy that Alcoa could acquire power at an effective rate that was below both the market-price and the statutorily prescribed IP rate. BPA contended, as it does here, that it could sell power to DSIs at a rate below the IP rate. We clearly held:
BPA’s interpretation of [its ability to sell power to DSIs at a rate other than the IP rate] is unreasonable on two grounds. First, it ignores the plain language of the statute and, in so doing, renders the IP rate superfluous. Second, it runs counter to the NWPA’s legislative history, which evinces Congress’s intent that BPA offer power to the DSIs, if at all, at the IP rate, not at some other rate of its choosing.
580 F.3d at 812-13. We also considered and rejected the argument that DSIs might be entitled to purchase power at the lower PF rate:
Having concluded that BPA must first offer DSIs the IP rate — and in light of Alcoa’s failure to identify which cost-based rate it thinks it deserves — we next consider whether the DSIs are also entitled to an offer at the PF rate. We hold that they are not---- [T]he plain language of § 839e(b) & (c) permits only one conclusion: that the DSIs are not entitled to the PF rate.
Id. at 818.
Because the size of the monetary payment to the aluminum DSIs would have resulted in higher rates for all other BPA customers, the court viewed it as inconsistent with BPA’s mandate to provide power at “the lowest possible rates to customers consistent with sound business principles.” Id. at 820-21 (quoting § 838g). Specifically, we held that “[i]n essence, BPA has voluntarily agreed to forgo revenues by charging the DSIs a rate below what is authorized by statute (ie., the IP rate) and below what is available on the open market. These foregone revenues result in higher rates for all other customers. This outcome is in apparent and direct conflict with BPA’s statutory mandate, see § 838g, and renders BPA’s decision to ‘monetize’ the DSI contracts in an amount reflective of those underlying rate decisions — albeit a capped amount — highly suspect.” Id. at 820-21. Thus, we considered BPA’s argument that it was acting in accordance with “sound business principles” and specifically re *804 jected the argument that such actions could trump BPA’s duty to charge the IP rate. We specifically held BPA had a duty to sell to Alcoa at the IP rate, rather than subsidizing it at a lower rate because this would require BPA to raise the rates it charged its other, customers. Id. at 822-23 (rejecting BPA’s rationale that it was in BPA’s business interests to offer this lower rate to the DSIs).
Instead of following the clear holding of PNGC I, BPA again tried to subsidize Alcoa. The economics of producing that subsidy led to another challenge. In PNGC II, BPA executed an amended contract with Alcoa that provided BPA would simply pay Alcoa up to $32,000,000 annually. 596 F.3d at 1080. That contract, too, would have resulted in higher rates for BPA’s other customers. Id. at 1080-81. We again concluded that many of the arguments BPA advanced as justifications for its contract with Alcoa could not support the conclusion that the contract was an exercise of sound business principles. Id. at 1082. There was no evidence in the record supporting BPA’s conclusion that Alcoa was likely to provide enough of a future benefit to BPA to make up for BPA’s annual transfer of $32,000,000 to Alcoa; in fact, the evidence was to the contrary. Alcoa was in decline and did not show a strong likelihood of recovery. Id. at 1083-84.
PNGC II expressly noted that a sale of physical power was a different situation from the monetary payment at issue, and was one that might require this court to defer to BPA:
[Although we do not defer to BPA’s determination that paying Alcoa $32 million was “consistent with sound business principles,” the agency’s conclusion that a physical sale of power to Alcoa, even at loss, furthered its business interests might very well warrant our deference.
Id. at 1085 (italics added). This dicta is what BPA believes frees it from recovering its costs, as required by the statute.
BPA interpreted the word “loss” in the hypothetical in PNGC II to mean that even if it sold power to Alcoa at a rate that failed to recover its costs, that decision might be justified.[4] BPA took this statement out of context. The panel was responding to the petitioner’s argument that BPA was required to sell power to Alcoa at the market rate — thus making a larger profit off of Alcoa, which could then be used to lower the PF rate BPA charged petitioners. Petitioners referred' to any rate below market rate as a “loss” because in their view BPA could be making more money if it charged Alcoa market rate, rather than the IP rate. Thus, the panel used the word “loss” in the sense of opportunity cost. In other words, it used the phrase to represent the difference between the market rate and the IP rate, not the difference between the rate BPA charges its customers and the costs of production. Hence, the panel was not writing on a case involving a loss resulting from BPA charg *805 ing a price below the IP rate. The rate would still have to be the IP rate as clearly-held in PNGC I, 580 F.3d at 812-13.
As shown above, BPA’s reading of the phrase “even at a loss” in PNGC II is taken out of context. We were still bound by those statutes in our ruling. Because the IP rate can never be below BPA’s cost, BPA is not authorized to sell power at a rate that would fail to recover its costs. Yet that is exactly what the Second Period of BPA’s contract with Alcoa does.
Ill
The Second Period of BPA’s contract with Alcoa will lose money, which the contract states BPA will recover by raising Petitioner’s rates.
Rather than recovering BPA’s costs and the same profit margin the IOUs make in reselling power (the IP rate), the Second Period of the contract between BPA and Alcoa actually plans for BPA to incur a net loss. The contract initially sets the cost cap — ie., the amount of loss BPA is willing to incur — at $300,000,000 over a five year period, but BPA can decide to increase this cost cap to $330,000,000.[5]
The Second Period of Alcoa’s contract with BPA violates the statutory mandate that BPA must recover all its costs. The paragraph titled “Cost Caps” states:
If service were to be provided to Alcoa for a Second Period, which requires the court to modify the Equivalent Benefits test, at a forecasted cost matching the maximum allowable under the Cost Caps, and if it were to be served at a weighted average annual IP rate linked to BPA’s Tier 1 PF rate forecasted to be $38.22 per Mwh, a cost of only $60 million per year, or $300 million for the entire Second Period, would be borne by the preference customers. (See Table 2 of Exhibit B in the Block Contract) Using the traditional yardstick that $60 million in cost per year translates into a one mill per kWh impact in the PF rate, the PF rate would increase by approximately one mill per kWh. That is a modest and tolerable rate increase, and one that BPA believes is reasonable given the tangible and intangible benefits of continued DSI service, as discussed in this ROD. We project that even with such an increase, the Tier 1 PF rate will be no more than 4% greater (and lower under an expected case) that they otherwise would be as a result of service to DSIs (all other things being equal), a level that continues to assure preference customers very substantial system benefits. The PF rate would still be substantially below expected market rates.
(Emphasis added). In other words, BPA has decided it will compel its preference and IOU customers to subsidize Alcoa in the amount of $330,000,000 over five years. BPA does not have the authority to do this.
During oral argument, counsel conceded that the second period of Alcoa’s contract with BPA would in fact result in a loss of $300,000,000. Counsel stated that BPA would not be able to generate the power Alcoa would need, and thus BPA would have to purchase the power on the open market. This creates the risk that the price on the open market will be greater than the BPA-Alcoa contract price. Coun *806 sel also conceded that the $300,000,000 to $330,000,000 was not just a cost cap, but would in fact be the actual loss BPA would sustain. As the contract states, this loss will result in a rate hike to BPA’s other customers up to 4%. Thus, the Second Period of BPA’s contract with Alcoa, which will result in BPA losing money (and having to raise the rates it charges its preferred customers and IOUs 4%), does not comply with the statutory mandate of § 839e(c)(l)(B), (2) that BPA charge Alcoa the IP rate.
Because the second Period of BPA’s contract with Alcoa anticipates that BPA will not recover its costs, and instead will lose $330,000,000, BPA is acting “in excess of [its] statutory authority” and we cannot defer to it. PNGC I, 580 F.3d at 806. Clearly BPA is not charging Alcoa the IP rate because, if it were, it would not be losing money by the performance of the contract.
Nor can Petitioners simply sue later to recover their damages if BPA continues this pattern of conduct. The Northwest Power Act states, in part, “For purposes of sections 701 through 706 of Title 5 [i.e., the Administrative Procedure Act (“APA”)], the following actions shall be final agency actions subject to judicial review ... 839f(e)(l)(G) final rate determinations under section 839e of this title.... ” 16 U.S.C. § 839f(e)(l). Accordingly, rate making is reviewed pursuant to the APA. Under the APA, “monetary damages” are not available. 5 U.S.C. § 702. BPA’s rates are the basis of this suit.
If Petitioners were suing BPA for a breach of contract, then they could sue for the total amount of their damages. 16 U.S.C. § 832a(f).[6] Here, however, BPA has not breached a contract with Petitioners. Rather, Petitioners have sued because BPA’s contract with Alcoa requires BPA to raise its rates with other third parties. Petitioner’s claim seeks a change in BPA’s rate making, and is thus under the APA. At most, it could be said that Petitioners are suing BPA for the negligent discharge of its duties. But then their recovery would be limited to a total of $1,000, 16 U.S.C. § 832k(a), not the $330,000,000 they have been overcharged.
IV
Petitioners have standing to challenge BPA’s contract.
Once BPA begins losing money under the Second Period of the contract, it will have no choice but to raise the rates of its other customers to make up for this loss. This is because BPA can neither go to Congress for the money nor seek damages from Alcoa.
In 1974, Congress stopped funding BPA’s operations and required BPA to finance its own operations from the rates that it charges for the sale and transmission of electric power. 16 U.S.C. § 838i; Aluminum Co. of Am. v. Bonneville Power Admin., 903 F.2d 585, 588 (9th Cir.1990). Thus, any loss BPA incurs from selling power to Alcoa must be recovered through an increase in rates. BPA cannot simply ask Congress for more money as so many other federal agencies do each year.
Further, BPA’s contract with Alcoa specifically states that BPA cannot seek dam *807 ages from Alcoa in the event this court holds that part of the contract exceeds BPA’s statutory authority.[7] Therefore, it is Petitioners who will be-harmed if the Second Period of the contract between BPA and Alcoa takes effect.
To have standing, Petitioners must demonstrate the existence of an injury in fact, that is, “an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.” Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (citations and internal quotation marks omitted).
Petitioners meet this standard.’ See PNGC I, 580 F.8d at 804 (holding that BPA’s preferred customers and IOUs had standing to challenge BPA’s contract with Alcoa because it would result in higher rates for the petitioners); Cal. Energy Comm’n v. Bonneville Power Admin., 909 F.2d 1298, 1306 (9th Cir.1990) (holding that one group of customers has standing to challenge a BPA contract when they demonstrated “1) that the challenged action caused them injury in fact, 2) that the injury was within the zone of interests to be protected by the statutes that were allegedly violated, and 3) that the relief sought would cure the injury.”); Alum. Co. of Am. v. Bonneville Power Admin., 903 F.2d 585, 590 (9th Cir.1989) (holding that a party has standing to challenge actions by BPA that result in that party paying higher rates than it would if BPA had complied with its governing statutes).
The problem with waiting until BPA and Alcoa enter into the Second Period to address the merits of the contract is that appeals can take quite a long time, especially complicated ones involving multiple parties, such as suits over BPA contracts. Although it is possible for Petitioners to obtain judicial review before the entire five year period would expire, the harm in this case would be ongoing, not something that occurs only upon completion of the entire five year period. Because BPA would be losing approximately $5,500,000 each month according to its own calculations, the harm Petitioners now seek to prevent through their current challenge would occur “before either this court or the Supreme Court can give the case full consideration.” Alaska Ctr. for Env’t v. U.S. Forest Serv., 189 F.3d 851, 855 (9th Cir.1999) (internal quotation marks omitted). Thus, it makes more sense for Petitioners to challenge the action before it goes into effect and seek a permanent injunction. And, as stated above, Petitioners cannot sue later to recover their damages. Once the damage is done, all they can do is seek a change in the rates BPA sets.
Because BPA has stated in its contract that it will raise Petitioner’s rates if the Second Period of its contract with Alcoa goes into effect, and because BPA cannot recover its losses any other way, Petitioners have demonstrated that if they are required'to wait until the Second Period of *808 BPA’s contract with Alcoa has begun to bring a challenge, they will suffer an “irreparable injury that is not correctable on review of final BPA action.” Public Util. Comm’r of Oregon v. Bonneville Power Admin., 767 F.2d 622, 630 (9th Cir.1985); Cal. Energy Comm’n v. Johnson, 767 F.2d 631, 634 (9th Cir.1985). Not only will an injunction or declaratory judgment remedy Petitioner’s injury, but it is the only thing that will remedy the injury, because the damages cannot be remedied after they occur.
V.
The parties continue to repeat their legal errors.
Nor is the case rendered moot by the parties’ statements that they will not enter into the Second Period unless this court issues an opinion that BPA is not bound by the Equivalent Benefits standard. The same rationale that applies to our review of the Initial Period of the contract — that it is an action capable of repetition yet escaping judicial review — applies to the Second Period as well. See discussion at Section III A of the majority opinion. In fact, Petitioners’ challenge to the Second Period of the contract makes far more sense than does their challenge to the Initial Period. By obtaining an injunction or a declaratory judgment, Petitioners can stop the loss before it happens, whereas if we wait to review the contract after it has taken place, all our decision could achieve is to prevent BPA from making the same mistakes again. It would not remedy or prevent the harm from occurring in the first place, which is what is needed. Feldman v. Bomar, 518 F.3d 637, 642-43 (9th Cir.2008); Friends of the Earth, Inc. v. Bergland, 576 F.2d 1377, 1379 (9th Cir.1978).
Although BPA has indicated in its letter to this court dated May 31, 2012 that it has extended the Initial Period of its contract with Alcoa instead of beginning the Second Period, BPA has a history of entering into contracts in which it attempts to subsidize Alcoa’s operations with terms similar to the Second Period.
This is the third time in a row that BPA has entered into a contract with Alcoa that is not based on the IP rate, and it is the third time in a row that all the parties have failed to read the plain language of the statutes. PNGC, 580 F.3d 828; PNGC I, 580 F.3d 792.
For the foregoing reasons, we should grant the petition and hold that the Second Period of BPA’s contract violates BPA’s statutory duty to charge DSIs the IP rate under 16 U.S.C. §§ 838g, 839a(10), 839e(b), 839e(b)(l).

. The Equivalent Benefits standard is an amorphous, undefined standard invented by BPA that does not appear in the statute, and that has not been clearly defined by BPA or our court. As best I can understand it, it allows the agency to incur losses by pricing power sales below its costs, so long as the agency finds that preserving employment at Alcoa will bestow benefit upon its other clients, in the greater scheme of things, equivalent to the higher rates they must pay to make up the loss caused by the below cost pricing. As explained in this dissent, this understanding of the Equivalent Benefits standard is flatly contradicted by higher authority: Congress’ statutes. See pp. 799-801 infra.

. 16 U.S.C. § 839a(10) defines "Federal base system resources” as:
(A) the Federal Columbia River Power System hydroelectric projects;
(B) resources acquired by the Administrator under long-term contracts in force on December 5, 1980; and
(C)resources acquired by the Administrator in an amount necessary to replace reductions in capability of the resources referred to in subparagraphs (A) and (B) of this paragraph.

. Importantly, in PNGC I, "[n]o party challenges BPA’s statutory authority to sell power at mutually agreed upon rates that have not been previously approved by FERC. This Court therefore assumes, without deciding, that BPA has such authority.” 580 F.3d at 803 n. 13.

. Even if the panel did overlook BPA’s statutory duty to sell to DSIs at the IP rate, we are not bound by this dicta, which was based purely on a hypothetical situation. We are bound only by dicta that is well-reasoned dicta. "[W]here a panel confronts an issue germane to the eventual resolution of the case, and resolves it after reasoned consideration in a published opinion, that ruling becomes the law of the circuit, regardless of whether doing so is necessary in some strict logical sense.” United States v. Johnson, 256 F.3d 895, 914 (9th Cir.2001) (en banc); see also Miranda B v. Kitzhaber, 328 F.3d 1181, 1186-87 (9th Cir.2003). The issue of sales below costs was not confronted in PNGC II. A hypothetical that is unnecessary in any sense to the resolution of the case, and is determined only tentatively (note the court’s use of the word "might”) does not make precedential law. Accordingly, it is not binding.

. Of course, any contract that was expected to result in an actual loss at all, let alone a $330,000,000 loss, would violate BPA's duty to charge DSIs the IP rate. §§ 838g, 839a(10), 839c(b), 839e(b)(l). As noted above, the IP rate is based on the PF rate plus the typical margin of profit charged by IOUs to their own industrial customers. § 839e(c)(l)(B), (2). The PF rate itself requires that BPA “shall recover” its costs. See §§ 839a(10), 839e(b)(l).

. 16 U.S.C. § 832a(f) provides as follows: “Subject only to the provisions of this chapter, the Administrator is authorized to enter into such contracts, agreements, and arrangements, including the amendment, modification, adjustment, or cancelation thereof and the compromise or final settlement of any claim arising thereunder, and to make such expenditures, upon such terms and conditions and in such manner as he may deem necessary.”

. Provision 21.11 of the contract, Waiver of Damages, provides:
In the event the Ninth Circuit Court of Appeals or' other court of competent jurisdiction issues a final.order that declares or renders this Agreement, or any part thereof, void or otherwise unenforceable, neither Party shall be entitled to any damages-or restitution of any nature, in law or equity, from the other Party, and each Party hereby expressly waives any right to seek such damages or restitution. For the avoidance of doubt, the Parties agree this provision shall survive the termination of this Agreement, including any termination effected through any order described herein.
BPA and Alcoa have also had similar provisions in their previous contract. See PNGC II, 596 F.3d 1065.